**KARRIE B. and Crystal B., minor children, by their Guardian ad Litem, Janine REEP, Appellants,**

v.

**CATHERINE J., and State of Alaska, Office of Children's Services, Appellees.**

No. S–12675.

Supreme Court of Alaska.

April 4, 2008.

Guy M. Kerner, Anchorage, for Appellants. Kirsten Swanson, Juneau, for Appellee Catherine J.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, Talis J. Colberg, Attorney General, Juneau, for Appellee State of Alaska, Office of Children's Services.

Before: FABE, Chief Justice, MATTHEWS, Eastaugh, CARPENETI, and WINFREE, Justices.

*OPINION*

MATTHEWS, Justice.

## I.   INTRODUCTION

The Guardian ad Litem (GAL) for two children in need of aid, Karrie and Crystal,[1] appeals a superior court order, arguing that the superior court erred as a matter of law in not terminating the parental rights of their mother, Catherine.

**1.**  Pseudonyms are used throughout the opinion to protect the privacy of the parties.

**2.**  The GAL listed as the co-author of the report is also the one who appeals in this case, Janine Reep.

## II.   FACTS

Catherine was born in 1978 in Juneau and is an Alaska Native. Catherine met Thomas B. shortly after she graduated from high school. Catherine and Thomas never married, but they had two children together: Karrie, born in 1998, and Crystal, born in 2001. The troubled story of Catherine and Thomas's relationship with their children, and with the Office of Children's Services (OCS), was set out in detail in the July 25, 2005 permanency report authored by the GAL [2] and Court Appointed Special Assistant (CASA) for Karrie and Crystal. The report covered the period from 1998–2005.[3]

Although the Office of Children's Services did not assume custody of Karrie and Crystal until 2002, OCS ... has been involved with the family for many years....

The first report of harm was received by OCS when Karrie was only two months old, on August 21, 1998. At that time, the police had taken Catherine and Karrie to her mother's home because of fighting in the home. Thomas became suicidal and was subsequently hospitalized. In November of 1998, police again were sent to the home because of "partying". Referrals were made for the family to ... [a] parenting/family center and Thomas was reportedly working with [a] Juneau ... [h]ospital. The OCS social worker noted that although they were cooperative, Catherine and Thomas also stated that they felt they were being "harassed" by OCS....

Problems escalated in 1999 with numerous police contacts due to partying and drinking at the family's apartment.... Three reports of harm were made to OCS regarding domestic violence and drinking. Thomas was arrested and charged for assault in April of 1999 when he pushed Catherine and knocked her to the floor during an argument at their home. In May of 1999, Catherine stabbed three holes in a door in their apartment with a knife in anger while she was intoxicated.

**3.**  The report did not use pseudonyms; all proper names have been replaced with pseudonyms in this reproduction of the report.

At first, Catherine steadfastly denied these actions, but finally admitted the truth after an OCS social worker located the stab marks in the door.

Catherine was arrested for assaulting another woman in September of 1999, again in the home. When the police arrived to arrest Catherine they found her lying on the bed, intoxicated, with Karrie, who was only 1 year and 3 months old at the time. Although Catherine was ordered to attend [counseling] for anger management in September of 1999, her probation was revoked in early December of 1999 for failure to follow through. Catherine was also arrested for driving while intoxicated in late December of 1999.

Catherine and Thomas both agreed to work a OCS case plan in early 2000. The family was reportedly engaged in couples counseling through [a] Juneau ... [h]ospital and Catherine was participating in counseling.... However, in May of 2000, Catherine was arrested at [a] ... [l]ounge for noncompliance with conditions of probation. In June of 2000, the family was evicted from their housing....

The family moved into [a] shelter where extensive family services and support were put in place. However, in July of 2000, Catherine was again arrested for non-compliance with her court ordered counseling. Thomas was arrested for furnishing alcohol to minors in July of 2000.

Crystal was born [i]n ... 2001. Less than one month later ... Catherine was arrested for disorderly conduct ... after she spit on another woman and raised her fist in a hostile manner. Catherine was again arrested in October of 2001 for non-compliance with her alcohol screening recommendations. The family was evicted from [the shelter where they were staying] through a court action filed in March of 2002. Catherine and Thomas were delinquent on their reduced rent, visibly intoxicated on the premises in violation of shelter rules and had refused to comply with requests for alcohol/drug testing and treatment or AA meeting attendance.

A police report of Catherine being intoxicated downtown was made on May 31, 2002, and another report regarding a domestic violence incident was received on June 28, 2002. The family was then living at [a hotel] under stressful conditions. On August 28, 2002, the police were called by Thomas regarding another domestic assault. Catherine was arrested because she had become angry with Thomas and punched him on his face and broke his cell phone. The present case was initiated in November of 2002 after Juneau Police officers found one year old Crystal and four year old Karrie unattended in their room at the [hotel] while both parents were out drinking. The children were placed in emergency foster care.

Thomas failed to follow through with most of the recommendations in his OCS case plan. Catherine participated in the Naltrexone program for substance abuse, and worked with [a] therapist ... on a weekly basis focusing on substance abuse and relationship issues. Finding affordable housing was a struggle due to the family's prior evictions due to non-payment of rent and domestic violence and drinking.

However, unbeknownst to OCS and the CASA/GAL, it now appears that Catherine was still actively drinking. On August 10, 2003, a taxi cab driver reported to the police that Catherine and another woman did not have money for their fare and were passed out in the vehicle. Another police report reflects that on September 9, 2003, Catherine and another male were engaged in a protracted altercation involving yelling, screaming, and scuffling....

With the help of OCS, the CASA/GAL, and the vigorous advocacy of the girls' foster parents ... affordable safe housing was finally secured for Catherine.... Crystal and Karrie were returned to Catherine's care in October of 2003. For a period of approximately six months, the household appeared to run smoothly. However, again, unbeknownst to OCS and the CASA/GAL, reports regarding drinking and violence were made to the police as early as April of 2004. On April 21, 2004, Catherine called the police because an intoxicated Thomas had barged into her residence, (although she had attempted to

block the door with a chair) pushed her down and took her cell phone. Catherine stated that both of her children were home, but "did not witness the altercation".

Additional police reports reveal that on May 23, 2004, Thomas called the police because of a domestic violence incident between he and Catherine.... Both parties accused the other of causing the problem. Catherine stated that Thomas kicked her and pushed her down in the presence of Karrie. (It is not clear where Crystal was at the time). Catherine also relayed to the police officer that she and Thomas had both been drinking. Five year old Karrie was interviewed by the police and confirmed that she saw her father push her mom down and kick her.

On August 15, 2004 a report was made to police that the residents in Catherine's apartment "fight all the time" and that a female was heard saying, "get off of me". A verbal altercation involving alcohol was confirmed. Police records state that a copy of the report would be sent to [the Division of Family and Youth Services[4]] because Catherine's two young children were in the residence, although this does not appear to have happened.

On August 17, 2004, Catherine was arrested for violently attacking Thomas. Both parties were intoxicated and alleged mutual combat. Catherine was placed under arrest for domestic assault and then had to be physically restrained on the floor of her home because she resisted being handcuffed. Karrie and Crystal were reportedly fast asleep and wakened up and taken to Catherine's sister's home. OCS was not called.

In October of 2004, Crystal and Karrie were placed in [a] ... foster home temporarily while Catherine was incarcerated for her assault conviction. Thomas moved to Oregon and Catherine struggled to care for the children on her own. In December, it was discovered that Catherine in anger, had pulled Karrie's arm hard enough to leave a large purple bruise and fingernail cuts. Catherine agreed to vol-

untarily place Crystal and Karrie with [a foster home] while arrangements were made for her to enter inpatient treatment with the children in Sitka in January of 2005.

After Catherine returned from treatment, concerns arose about conditions in the home and Catherine's ability to provide for the children. Karrie's teacher made a report of harm to OCS based on her observation of a drastic negative change in Karrie's personality and behavior. Karrie reported that her mother was dragging [them] by the hair and grabbing [them] by the arm and it hurt[ ]. Catherine had stopped communicating with the school and sending in homework for Karrie as she had previously done, and Karrie's progress in school drastically declined.

When efforts were made to address these concerns Catherine demonstrated paranoid, volatile, angry behavior by yelling and using profanity towards her OCS social worker. Catherine also indicated that she was no longer interested in allowing the children to visit with [the foster family] or CASA Susan Ashton who had all been steadfast supporters of Catherine's reunification with the children and basically the family's safety network. In addition Catherine stated that she no longer wanted Karrie to work with her counselor from AWARE, but wanted her to see a new counselor at SEARHC [SouthEast Alaska Regional Health Consortium]. Catherine came to an OCS meeting sharing her plans to move down to Oregon with the girls to be near Thomas.

When OCS social workers took steps to investigate the report of concern, Karrie blurted out that her mother was being mean to them and had poured stuff in her and Crystal's hair (later described to be something like salad dressing) and rubbed it in. Given Karrie's state of fear and anxiety, Catherine's refusal to acknowledge valid concerns, her lack of emotional control, and her refusal to work with her identified support system, the decision to

---

**4.** Now the Office of Children's Services.

remove Karrie and Crystal from their mother's home was made.[5]

The September 23, 2005 permanency report by OCS noted that Catherine had been involved in two additional alcohol-related incidents. As for Thomas, OCS reported that he was not in compliance with the case plan developed for him and "continues to lead a nomadic lifestyle, has not maintained contact with OCS, and has infrequent telephone contact with his children." The report concluded that OCS had "decided to file a Petition for Termination of Parental Rights" for Thomas and Catherine and would do so within the next two months.[6]

In February 2006 Catherine relocated to Kenai as part of a treatment plan recommended both by OCS and SEARHC. Karrie and Crystal joined her in March 2006. As part of her treatment in Kenai, Catherine participated in a chemical dependency program administered by the Kenaitze Indian Tribe. A report dated May 25, 2006, from the center administering the program stated that Catherine was doing "fantastic."

The expectation was that Catherine would live in Kenai for a year. But as early as April 2006, Catherine began inquiring about returning to Juneau.[7] On July 9, 2006, Catherine was found "intoxicated and 'passed out'" at home with her children. Karrie and Crystal were returned to Juneau on July 14, 2006, after briefly being placed in foster care in Kenai. Catherine returned to Juneau on August 7, 2006, and enrolled in an inpatient program at the Rainforest Recovery Center.[8]

She completed this program in early September and participated in Rainforest's ongoing care program afterwards. Catherine's substance abuse counselor at Rainforest described her prognosis as "guarded." The discharge statement from the outpatient program stated that it seemed the "client was blaming the system for her problems and had some difficulty taking full responsibility for her drinking and past choices."

The latest permanency report indicated that Thomas was still not complying with his case plan and "ha[d] not made OCS aware of any active efforts to seek out services."[9]

## III. PROCEEDINGS

### A. The Termination Hearing

The termination hearing for Thomas and Catherine took place over six days in 2007 (January 10, 11, 12, 19; March 8; and April 3). Thomas was telephonically present for the hearing only on March 8 and April 3; he was told that the next permanency hearing was scheduled for October 11.[10] He opposes the termination of his parental rights, but is not a party to this appeal and was not the subject of the court's final order. A representative from Catherine's tribe was present telephonically at the hearing.

The hearing dealt almost entirely with Catherine and her behavior and the well-being of Karrie and Crystal. Although several witnesses and experts testified that there was a strong bond between Catherine and her children, they also testified that Catherine consistently exhibited bad judg-

5. The superior court judge gave a summary of these facts that is substantially similar.

6. The July 25, 2005 report recommended that "a petition for termination of parental rights ... should be pursued" so that Karrie and Crystal could be "freed for adoption." OCS first recommended adoption over reunification in a June 13, 2005 report.

7. Testimony from an employee at the treatment center in Kenai indicated that Catherine was having trouble adjusting being away from her community and culture and had difficulty finding transportation and daycare for her children.

8. This appears to have been with the consent of the treatment center in Kenai.

9. At the termination hearing on January 10, 2007, the court stated that Thomas

> has essentially dropped from sight since at least, as best as I can recall, 2004 and has had ... to my knowledge, little, if any, contact with the children or the children's mother since some time in late 2004 and has not provided for them ... in any meaningful way for far more than a year.

None of the parties took issue with this summary.

10. It later was continued to November 19, 2007, and findings and an order were issued on January 16, 2008. *In re K.B. & C.B.*, Nos. 1JU–02–118A CP, 1JU–02–119A CP, at 1 (Alaska Super., January 16, 2008) (Amended Findings and Order on Extension of Custody and Permanency).

ment and repeatedly placed her own needs before the needs of her children. Katheryne Calloway, who worked with Catherine and her children at OCS, stated, "I believe that [Catherine] tries. I believe she loves her children. She wants to parent her children.... [But] I think that there are certainly limitations in her capacity to develop the skills necessary to do that consistently."

One theme repeatedly pressed by the State and the GAL was that Catherine was prone to "cycles," where she would show signs of improvement, yet then slip back to her old behavior. Julie Harbers, who worked on Catherine's case at OCS from February 2005 to July 2006, remarked that Catherine was "able to make short-term commitments ... [and was] very, very proactive in the beginning" but was "not able to sustain ... that positive drive to continue to be clean and sober and follow the advice of providers." A particular focus of the hearing was on Catherine's time in Kenai and her return to Juneau. The State and the GAL portrayed this as further evidence of Catherine's "cycle" of apparent improvement and then devastating relapse despite the best efforts of OCS and related service providers. Catherine and her counsel argued that the move to Kenai was a poorly planned attempt to help Catherine, which took her away from her cultural and social support network and set her up for failure.

There was also extensive testimony about Karrie and Crystal's anxiety and depression. A mental health expert testified that Karrie's "concerns about maternal deprivation and safety .... [were] taking up so much psychic energy and emotional energy that her attention and concentration in other areas could be easily disrupted." A therapist for the children testified that when the girls were with Catherine there was a "deterioration of their behavior" but "when they were in foster care in a structured, stable environment, they did better." A social worker testified that she saw "yearly patterns of repeated behavior" in Karrie and Crystal and that she was "concerned that [Karrie] is self-harming

... [and] concerned that [Crystal] is running out into the street and hitting and biting and spitting." Catherine testified on her own behalf at the hearing, expressing that she would "like to see that [her children] have a loving, caring parent, something that is healthy, and not have any of these issues be addressed to [her] children again, the domestic violence, the alcohol abuse that's been in their lives."

It became evident during the hearing that there was no clear long-term placement plan for the children if Thomas's and (especially) Catherine's parental rights were terminated. There were discussions at the hearing about awarding guardianship to Catherine's sister and her brother-in-law, with whom Karrie and Crystal briefly resided. But by February 28, 2007, that placement had failed,[11] and the children were transferred to a foster family with whom they previously had stayed. The foster parents later indicated that they could not keep Catherine's children "long-term." On the final day of the hearing it was suggested that "possibly a permanent placement" could be made with a school teacher of Karrie's.

### B. The Court's Remarks at the Hearing and Its Final Order

At the hearing, Superior Court Judge Patricia R. Collins expressed her belief that the case was a difficult one to decide. "I have a hard decision to make," she said on January 19, 2007, and also: "[S]eldom have I had a case that really was so difficult." The court stated that "the State has met its burden on virtually every element that must be proved to terminate the legal power of a parent to act, in other words what we call parental rights." The court said that the children deserved stability in their lives and to know that their parent would be sober and stable. The court also observed that the children were "children in need of aid" and that Catherine had "committed acts of assaultive behavior toward the children and ... threatened them with bad things if they related that to others." The court opined that Cath-

---

11. According to the hearing transcript, there had been either a domestic violence incident or a mere "verbal disagreement" (according to Cath-
erine's attorney) in Catherine's sister's household. Catherine's sister and her brother-in-law no longer were living together.

erine's behavior showed disturbing "patterns," especially with regard to anger and alcoholism, and viewed the Kenai episode (Catherine going and then wanting to return to Juneau) as part of a pattern of Catherine "being unable or unwilling to put her children's needs before her own." At the same time, the court stated that it was clear that "[t]hese children love [Catherine], she loves them, and she's always going to be their parent." On January 19 the court decided to wait forty-five days before making its final order.

On March 8, 2007, the court again emphasized "how close a question ... this case presents." Given how "incredibly close" the question was, the court issued a qualified denial of the State's petition to terminate Catherine's parental rights, adopting what it referred to as the "recommendation by the tribe," which was "denying the petition to terminate" but leaving the State "to reapply basically any time after July." The court elaborated that its position allowed the State to petition for termination "should any circumstances arise that would suggest a continued pattern, such as the one that has existed for many years of actions by the mother" that led to instability for the children. The court added that if the State filed another petition for termination, the court "would not expect the state to start from ground zero."

This position found expression in the final order issued by the court on April 2, 2007. The court found that Catherine had failed, within a reasonable time, to remedy the conduct that placed her children at risk and that returning the children to her care "would place the children at substantial risk of physical or mental injury." The court further found that efforts had been made to enable the children to return home safely but that those efforts had failed. The court's final finding was that there was evidence "beyond a reasonable doubt" that "return of the children to the parent's custody is likely to result in serious emotional and/or physical damage" to them. The order spared few words in expressing the court's grave reservations about Catherine's problems with anger and drinking, and its concern that Catherine's children "are already showing signs of problems similar to those suffered" by Catherine.

But the court wrote in its legal conclusions that "[t]he state ha[d] met its burden of proof with respect to termination of parental rights in every respect *except whether it is in the children's best interests to terminate [Catherine's] parental rights at this point.*" (Emphasis added.) The court gave its reasons for its "decision to *deny/delay decision* on termination" (emphasis added) as follows:

(1) [T]he children are bonded to their mother and want to be with her; (2) the children are/were living with their maternal aunt ... at the time of hearing and determination of the appropriateness of this placement as a potential long-term placement is premature; (3) [Catherine] has (apparently) been sober for more than six months and at least expresses determination to make the changes necessary to effectively parent her children; (4) the Tribe has asked the court to delay decision for six months to essentially see if [Catherine] can demonstrate sobriety for a full year and will participate in the programs necessary to address her anger issues and parenting skills; (5) while the children need stability, termination of parental rights does not guarantee the children "stability"—no long-term placement/potential adoption options are clearly apparent at this point and the children's closest ties appear to be with their mother and maternal relatives; former long-term foster care providers for the children have indicated they cannot be considered for a permanent placement.

Immediately after this, the order added that the State "may reapply for termination after six months from the hearing date." The order did not discuss terminating the parental rights of Thomas, and he is not a party to this appeal.

The GAL appeals from the April 2, 2007 order.

The State of Alaska, Office of Children's Services also challenges the decision not to terminate the parental rights of Catherine. However, the State enters this case not as an appellant but as an appellee. The State could have entered this case as an appel-

lant[12] but failed to do so. As an appellee, the State may support the points on appeal argued by the GAL. But the State attempts to do more. It advances arguments attacking the judgment that are not presented by the GAL. This it may not do.[13] Catherine, rightly, does not reply to the State's brief. Likewise, we do not consider the State's arguments that do not address points on appeal argued by the GAL.

## IV. STANDARD OF REVIEW

In child-in-need-of-aid (CINA) cases, we affirm the findings of the trial court unless they are clearly erroneous.[14] Whether the court's findings comport with the Indian Child Welfare Act or with CINA statutes is a question of law that we review de novo.[15] We also "bear in mind at all times that terminating parental rights is a 'drastic measure.'"[16]

## V. DISCUSSION

The GAL does not attack as clearly erroneous as a matter of fact the superior court's conclusion that the State had not met its burden of proof with respect to whether it is in the children's best interests to terminate their mother's parental rights. Instead, the GAL points to three specific claimed errors of law that underlie the court's conclusion. In the paragraphs that follow we discuss these claims in the order that they are presented.

In her brief, Catherine argues that this appeal is moot "since the State will go forward on October 10, 2007 and request termination of parental rights." The State has

filed a renewed petition for the termination of parental rights, and a hearing has been scheduled for April 24, 2008.[17]

According to AS 47.10.088(k), the court "shall issue an order on the petition to terminate within 90 days after the last day of the trial on the petition to terminate parental rights." In compliance with this subsection, Judge Collins's order unambiguously "ORDERED that the petition to terminate parental rights and responsibilities of [Catherine] is denied." Accordingly, the order was a final, appealable order under CINA Rule 21(a) and Appellate Rule 218. The GAL is correct that the appeal is not moot because the order has not been supplanted by subsequent proceedings and whether it will be is uncertain.

### A. The Superior Court Did Not Err as a Matter of Law in Considering the Lack of Adoptive Placement Options as Part of Its Analysis of the "Best Interests" of the Children.

The GAL first argues that the superior court made an error of law by considering the fact that "OCS lacked an adoptive placement" in making its decision not to deny termination of Catherine's rights. The court made two points in relation to permanent placement for Karrie and Crystal: first, that it would be "premature" to decide whether placement with Catherine's sister would be appropriate for the children, and second, that the children's stability would not be assured by terminating Catherine's parental rights because "no long-term placement/potential

---

12. The State was a party in the case below. *See* Alaska R.App. P. 204(g) ("All parties to the trial court proceeding when the final order or judgment was entered are parties to the appeal. A party who files a notice of appeal ... is an appellant under these rules. All other parties are deemed to be appellees, regardless of their status in the trial court.").

13. *Alaska Brick Co. v. McCoy*, 400 P.2d 454, 457 (Alaska 1965) ("[O]rderly procedure will not permit an appellee to attack a judgment for the first time in his brief in the appellant's appeal.").

14. *Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 935 (Alaska 2004) (quoting *Brynna B. v. State, Dep't*

*of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

15. *Id.*

16. *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003) (quoting *R.J.M. v. State*, 946 P.2d 855, 861 (Alaska 1997)).

17. *In re K.B. & C.B.*, Nos. 1JU–02–118A CP, 1JU–02–119A CP, at 4 (Alaska Super., January 16, 2008) (Amended Findings and Order on Extension of Custody and Permanency) ("The continued termination trial to address the best interest of the children is scheduled for two days beginning April 24, 2008 at 9:00.").

adoption options are clearly apparent at this point."

■ The GAL cites *Carl N. v. State, Department of Health & Social Services*[18] in support of her claim that it was an error of law to consider placement options as part of the children's best interests. But *Carl N.* at best provides weak support for this claim. In *Carl N.*, the father argued that termination of his rights was not in the child's best interests because "termination would not lead to a permanent placement" for the child.[19] We rejected his argument and affirmed the termination of his parental rights. But we credited the fact that the foster parent for the child was "committed to caring for [the] child until he turned eighteen."[20] Thus, the court in *Carl N.* did look at placement options for the child, albeit not permanent placement. Relatedly, we have held that the fact that a child has bonded with her foster parent can be a factor in considering whether it is in the child's best interests to terminate a parent's rights.[21] Thus, a court may consider favorable present placements as a factor in a best interests analysis. It follows that a court can also consider the fact that there are no favorable permanent placement options for a child (as in this case) as a factor in determining whether terminating a parent's rights would be in a child's best interests. The GAL's use of *Carl N.* is unpersuasive.

Somewhat more on point is *S.H. v. State, Department of Health & Social Services,*[22] also cited by the GAL. In *S.H.*, the father argued that it was extremely unlikely that one of his children would find adoptive placement because of the child's severe behavioral problems.[23] We affirmed the termination of the father's parental rights in spite of the conceded difficulty in finding permanent placement for the child and the "need for [his] children to be placed immediately in a permanent stable home."[24] But the fact that a lack of permanent placement options did not prevent the termination of the father's rights in *S.H.* does not support the proposition that, as a matter of law, lack of permanent placement can *never* be a factor in deciding whether termination would be in the child's best interests. At most, *S.H.* suggests that lack of permanent placement will not necessarily be a decisive factor in deciding whether to terminate parental rights—not that it can never be a consideration.

There is thus no basis for holding that the superior court erred in considering in part the absence of favorable long-term placement options when it reached its conclusion concerning the children's best interests.

**B. The Superior Court Did Not Err as a Matter of Law in Considering the Mother's Determination To Change as Part of Its Analysis of the "Best Interests" of the Children.**

■ The GAL's second argument is that it was an "error of law on the part of the Superior Court" to rule that "it was not in the best interests of Karrie and Crystal to terminate their mother's parental rights due to the expressed determination of Catherine to change her behaviors." This is on its face a puzzling claim. The superior court in issuing its final order stated that Catherine "has (apparently) been sober for more than six months and at least expresses determination to make the changes necessary to effectively parent her children." The court also held out the hope that Catherine might be able to "demonstrate sobriety for a full year" and would "participate in the programs necessary

18. 102 P.3d 932 (Alaska 2004).

19. *Id.* at 937.

20. *Id.*

21. *See M.W. v. State, Dep't of Health & Soc. Servs.,* 20 P.3d 1141, 1147 (Alaska 2001) ("Moreover, the state correctly points out evidence indicating that it is in [the child's] best interests to remain with her foster family because she had bonded to them."); *see also A.H. v. State, Dep't of Health & Soc. Servs.,* 10 P.3d 1156, 1166 (Alaska 2000) ("Given the significant needs of the children, their attachment to their foster mother, and A.H.'s failure to improve his behavior, substantial evidence exists to support the superior court's best interests finding.").

22. 42 P.3d 1119 (Alaska 2002).

23. *Id.* at 1124–25.

24. *Id.* at 1125.

to address her anger issues and parenting skills." In considering the best interests of a child in non-CINA cases, the legislature has directed courts to consider "the capability and desire of each parent to meet" the child's needs.[25] Certainly, Catherine's ability to stay sober and her determination to remain sober were relevant factors to consider as part of the children's best interests under AS 47.10.088(c).

The GAL's argument seems to be that because the "amount of effort by the parent to remedy the conduct" is a "best interests" factor under AS 47.10.088(b)(2),[26] then as a matter of law the court could not consider Catherine's "determination to make the changes necessary" to parent her children under the best interests analysis of AS 47.10.088(c). But AS 47.10.088(c) is more capacious than AS 47.10.088(b)(2). Alaska Statute 47.10.088(b)(2) only requires a court to consider whether the parent has failed to remedy, in a reasonable time, the conditions that have placed her child at substantial risk of harm. It does not require a comprehensive judgment as to whether the child's best interests favor the termination of parental rights, as AS 47.10.088(c) does.

█ It is true that when a court finds that a parent has not remedied her poor behavior in a reasonable time under AS 47.10.088(b)(2), it also may readily find that termination of parental rights is in the chil-

dren's best interests under AS 47.10.088(c).[27] But if finding that a parent has not remedied the conditions that put her child at risk "within a reasonable time" meant that it was always in the child's best interest to terminate parental rights, then subsection (c) of the statute would be redundant, because the best interests of the child already would have been settled by the analysis of AS 47.10.088(a) and (b). Intuitively, and as set forth by statute [28] and by our case law,[29] factors such as the mother's determination to change and her capability to do so are relevant to what is in the best interests of the child. We conclude that the superior court did not err as a matter of law in considering these factors in making its decision.

**C. The Superior Court Did Not Err as a Matter of Law in Considering the Mother–Child Bond as Part of Its Analysis of the "Best Interests" of the Children.**

█ An important reason for the court's decision to deny the petition to terminate Catherine's parental rights was that "the children are bonded to their mother and want to be with her." The GAL's opening brief argues that Karrie's and Crystal's adoptions could be "open," meaning that Catherine would still be involved with the children even if her parental rights were terminated. It also notes the possibility of a

**25.** AS 25.24.150(c)(2).

**26.** In deciding whether a parent has failed to remedy the conditions that put her children at substantial risk, the court can consider "any fact relating to the best interests of the child" including "the amount of effort by the parent to remedy" her bad behavior. AS 47.10.088(b)(2).

**27.** See, e.g., Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 74 P.3d 896, 902–03 (Alaska 2003) ("Judge Lohff found that the children were in need of aid and that Sherry had failed, within a reasonable time, to remedy the conduct or conditions that placed the R. children at substantial risk of physical or mental injury. Accordingly, Judge Lohff terminated Sherry's parental rights."); S.H., 42 P.3d at 1126; J.H. v. State, Dep't of Health & Soc. Servs., 30 P.3d 79, 87 (Alaska 2001) ("The same evidence of emotional risk to [the child] from an unstable relationship, combined with the evidence indicating that [mother] was relapsing . . .

also supported the superior court's finding that termination of . . . parental rights would be in [the child's] best interests.").

**28.** AS 25.24.150(c)(2) (in determining custody, best interests includes capability and desire to meet child's needs).

**29.** The GAL's brief cites several cases in which the fact that a parent did not show progress or a determination to change is relevant to assessing whether it would be in the child's best interests to terminate parental rights. See, e.g., Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 66 P.3d 1, 8–9 (Alaska 2003) (mother's slow improvement supports termination of parental rights); J.H., 30 P.3d at 87 (mother's relapse supports judgment that termination of mother's rights would be in child's best interests). It follows from these cases that signs indicating improvement would be germane to a decision that it was in the child's best interests not to terminate parental rights.

tribal adoption, which would also be open. Failing that, the GAL states that under AS 47.10.089(h) Catherine can petition the court for redress "prior to adoption of the children." [30] Catherine replies that these options "make the likelihood of a continued involvement between [her] and her children after termination slim at best." Catherine also argues that considering the bond existing between parent and child is appropriate in determining the best interests of the child.

 Catherine's argument is plainly correct on this point and the GAL's argument that the bond between parent and child may

not be permissibly considered because some level of continuing contact is possible after termination lacks merit.[31]

## VI. CONCLUSION

For these reasons, we AFFIRM the judgment of the superior court.

---

30. This seems to be an incorrect reading of AS 47.10.089(h), which applies only when a parent has "voluntarily relinquished" her parental rights.

31. *See* AS 25.24.150(c)(4) ("love and affection" existing between child and parent relevant to best interests analysis); *see, e.g., Pinneo v. Pinneo*, 835 P.2d 1233, 1238 n. 12 (Alaska 1992) (affirming decision awarding custody to father because the superior court found it in "the best interests of the children that the bonds of love and affection between [the children] and their father not only be preserved, but that they be rebuilt").

The GAL's reply brief asserts that preserving the bond between Catherine and her children will cause them "emotional and mental harm." It concludes that the bond between mother and children "standing alone" does not overcome "the multiple treatment attempts of the mother that all failed in dramatic and heart-breaking ways." The claim in the GAL's reply brief thus seems to be that the factual finding regarding the best interests of Karrie and Crystal is a "clearly erroneous" finding of fact and not just premised on a legal error. This is a new argument that we will not consider because "new arguments presented for the first time in reply briefs are considered waived." *Danco Exploration, Inc. v. State, Dep't of Natural Res.*, 924 P.2d 432, 435 n. 1 (Alaska 1996).