NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MAEVE F., | ) | |
| | ) | Supreme Court No. S-18794 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-20-00054 CN |
| v. | ) | |
| | ) | <u>MEMORANDUM OPINION</u> |
| STATE, DEPARTMENT OF FAMILY | ) | <u>AND JUDGMENT</u>[*] |
| AND COMMUNITY SERVICES, | ) | |
| OFFICE OF CHILDREN'S | ) | No. 2035 – June 26, 2024 |
| SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Earl A. Peterson, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

## I.    INTRODUCTION

A mother challenges the termination of her parental rights, arguing that the Office of Children's Services (OCS) failed to provide reasonable efforts and that

---

[*]      Entered under Alaska Appellate Rule 214.

the court clearly erred in its best interests analysis. Seeing no error or clear error, we affirm the termination order.

## II. FACTS AND PROCEEDINGS

### A. Initial OCS Involvement And First Emergency CINA Petition

In January 2020 Dov F.[1] was born with underdevelopment of his right ear and jawline and abnormalities in his kidneys. The umbilical cord tested positive for THC, which indicated his mother, Maeve F., was using THC during the last half of the pregnancy. Maeve had previously been diagnosed with borderline personality disorder.[2] She has two older children that lived with her at the time.[3]

In early March OCS received a report that Dov had not received medical care in over a month despite his multiple medical conditions. After receiving the report and learning that one of the children's fathers was concerned about Maeve's substance abuse, OCS worked with Maeve on safety planning. At the end of March, when one of the older children tested positive for methamphetamine, the OCS caseworker developed a second safety plan. Shortly thereafter Maeve refused to continue to participate in that safety plan, and OCS removed the three children from Maeve's custody and filed an emergency petition for temporary custody. Around the time of this removal Maeve tested positive for THC and Dov tested positive for methamphetamine and amphetamine.

---

[1]     We use pseudonyms for all individuals in this case.

[2]     Borderline personality disorder is a diagnosis "characterized by impulsivity and unpredictability, unstable interpersonal relationships, inappropriate or uncontrolled affect, especially anger, identity disturbances, rapid shifts of mood, suicidal acts, self-mutilations, job and marital instability, chronic feelings of emptiness or boredom, and intolerance of being alone." 259810 *Borderline Personality Disorder*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2014).

[3]     This appeal does not concern the parental rights with respect to those two children.

At a temporary custody hearing[4] in April, the superior court ordered OCS to implement a safety plan and to return the children to Maeve's custody with OCS supervision because the court found it was unclear who was exposing the children to controlled substances. The court determined that the children were children in need of aid because they were at risk of harm due to substance abuse.[5]

B. **Continued OCS Involvement, Second Emergency CINA Petition, And Removal**

Later in April and May the caseworker referred Maeve to drug testing and a substance abuse assessment and developed several safety plans for the family. In May Maeve tested positive once for amphetamine, methamphetamine, and THC.

In June OCS updated the safety plan and case plan. Maeve completed a psychosocial assessment that recommended that she engage in therapy and develop a plan for substance abuse education and relapse prevention.

In July Maeve tested positive for THC three times and Dov tested positive once for amphetamine and THC. The caseworker and the family were unsure who exposed Dov to substances. In response the caseworker created an out-of-home safety plan.

At the end of July the safety plan participants could no longer take care of Dov, so OCS took emergency custody of him and filed a second emergency CINA petition. OCS alleged Dov was a child in need of aid for several reasons,[6] observing this was the fourth failed safety plan and second time Dov tested positive for methamphetamine. The petition noted that Maeve identified bipolar disorder as

---

[4] *See* CINA Rule 10.

[5] *See* AS 47.10.011(10). The court declined to find that the children were in need of aid due to medical neglect. *See id.* (4).

[6] *See* AS 47.10.011(6) (physical abuse), (9) (neglect), (10) (substance abuse), and (11) (risk of harm from mental illness).

impacting her substance abuse.[7]  The caseworker said that Maeve was a tenacious advocate for her family, but that she was not always willing to take responsibility for testing positive and for resolving who exposed Dov to substances.

After learning that Maeve was not responsible for Dov's positive drug test, OCS returned him to Maeve's care and developed a new in-home safety plan.  During a hearing in August, the court determined OCS was making reasonable efforts to support the family, and it allowed custody to remain with Maeve, with OCS maintaining supervision.

Maeve attended seven psychotherapy appointments between August and October but missed ten drug tests during that period.  She tested positive for methamphetamine and amphetamine at the end of October, at which time Dov tested positive for amphetamine, THC, and opiates.  In early November OCS removed Dov from Maeve's care, placed him with a foster family,[8] and sought removal findings due to Maeve's substance use and Dov's exposure to drugs.

### C.   Continued OCS Efforts And Maeve's Treatment

In December 2020 and January 2021, Maeve missed 17 drug testing appointments.  At a probable cause hearing in January the court found that Dov was a child in need of aid.[9]  It found that removal was in Dov's best interests and that OCS was making reasonable efforts to reunify the family.

---

[7]     The caseworker testified that the second emergency petition listed Maeve as having bipolar disorder because Maeve mentioned having BPD to the caseworker and then later, Maeve clarified she was diagnosed with Borderline Personality Disorder. This was understandable given that Maeve's mental health assessment mentioned both a previous diagnosis of bipolar disorder and her current borderline personality disorder diagnosis.

[8]     The other two children were placed with their respective fathers.

[9]     *See* AS 47.10.011(6) (physical abuse), and (10) (substance abuse).

In February the caseworker revised Maeve's case plan with goals to treat both her substance abuse and mental health issues. The case plan referred Maeve to a substance abuse assessment and a parental risk assessment and psychological evaluation. When the psychological evaluation and parental risk assessment were delayed due to Maeve rescheduling and missing an appointment, the evaluating psychologist recommended that Maeve engage in individual therapy pending the evaluation, but Maeve refused. She missed 11 drug testing appointments in February and March and tested positive once for amphetamines and opiates.

In July OCS referred Maeve to parenting classes, which she attended inconsistently, and she was eventually discharged for missing class. In early July Maeve tested positive for amphetamines and opiates. Later that month Maeve completed the psychological evaluation and parental risk assessment she had been referred for. The evaluating psychologist recommended that Maeve undergo, at a minimum, outpatient substance abuse treatment paired with drug testing, and stated that a dual-diagnosis inpatient program[10] would be best for Maeve. The psychologist also recommended that Maeve attend therapy, follow other mental health coping strategies, and receive parenting education.

At the end of July, the caseworker completed a family case plan with a goal of placing Dov with Maeve in inpatient treatment once she stabilized. In July and August Maeve entered two different inpatient dual-diagnosis treatment programs, but she left early both times against medical advice. That summer she missed eight drug tests and tested positive for amphetamines and opiates. During two hearings in August and September, the court determined OCS was providing reasonable efforts.

By mid-December 2021 Maeve was once again referred for inpatient dual-diagnosis treatment. OCS indicated that its plan was to place Dov with Maeve at the

---

[10] A dual-diagnosis program refers to treatment for both mental health needs and substance abuse challenges.

inpatient treatment facility once she had stabilized. However while in treatment during December and January Maeve tested positive on six occasions for various combinations of drugs, including heroin, fentanyl, and methamphetamine. In January she was involuntarily discharged from inpatient treatment because she left treatment and denied continued substance abuse. But she continued to work with the inpatient facility's mental health therapist following her discharge. In February the caseworker referred Maeve to another dual-diagnosis inpatient treatment facility that would have allowed a trial home visit with Dov, but Maeve refused to enter treatment.

In early March OCS filed a petition for termination of Maeve's parental rights of Dov. Meanwhile she had a negative drug test in April and began an outpatient treatment program that she later completed. During a permanency hearing at that time, the court determined that OCS was providing reasonable efforts to reunify the family and that the goal should remain reunification. But between May and August, Maeve missed 15 scheduled drug tests.

In September she tested positive for amphetamines. The next month she completed an assessment that recommended more intensive dual-diagnosis inpatient treatment.

### D.    Termination Trial And Maeve's Treatment

The court held a nine-day termination trial from October 2022 to February 2023. Due to the extended span of time, OCS provided updates on Maeve's status and OCS's continued efforts during trial.

Eight witnesses testified on behalf of OCS: four OCS caseworkers, a psychologist, an intake clinician, a forensic toxicologist, and an OCS supervisor. The court admitted over 50 exhibits that documented OCS's efforts to reunify Maeve with Dov, including drug testing referrals and results, safety plans, case plans, case plan

evaluations, family plans, the psychological evaluation and parental risk assessment, and Maeve's therapy records. [11] Maeve called her mental health therapist as a witness.

### 1. October to December 2022 efforts and treatment progress

After testing negative for substances in October, Maeve tested positive for fentanyl, amphetamine, and heroin in November. In December the OCS supervisor testified that there was no evidence of "sustained behavior change," but if Maeve successfully completed treatment a trial home visit was possible in three to five months. She acknowledged that Maeve had completed an outpatient treatment program but discounted this progress because she had subsequently relapsed and it was now recommended that Maeve receive inpatient treatment.

By mid-December Maeve tested positive twice for various drugs, including fentanyl and methamphetamine. Maeve again entered dual-diagnosis inpatient treatment.

Meanwhile, at the termination trial, the current caseworker testified that Dov attended specialized medical appointments and services and was doing well. She stated that Maeve had weekly supervised visits with Dov but Maeve had a history of missing visits or arriving late. She described continued contact between Dov and his two siblings that she believed would remain if parental rights were terminated. After acknowledging that Maeve "is a great, attentive mother in her visits with her children," the caseworker nonetheless testified that Maeve's history of substance abuse and relapse did not show long-lasting behavior change.

Maeve's therapist testified about Maeve's borderline personality disorder diagnosis and her progress in learning coping skills to deal with her disorder. The therapist believed Maeve had progressed in substance abuse treatment and concluded

---

[11] The guardian ad litem participated in the trial through questioning witnesses, but did not call any of her own witnesses nor admit any evidence.

that if Maeve finished her current program, she could progress to a less intensive program.

### 2. January to February 2023 testimony, efforts, and treatment progress

In January 2023, while in treatment, Maeve tested positive for various combinations of drugs, including methamphetamine and fentanyl. At the end of that month, she was once again discharged from inpatient treatment and referred to a recovery center in California.

Maeve's therapist subsequently testified that she believed Maeve was not ready to change and that she still needed to undergo at least five more months of treatment. The therapist was not treating Maeve at the time of her testimony, and she testified she believed Maeve was receiving treatment in California. Two OCS caseworkers then testified that Maeve had returned to Alaska. OCS tried but was unable to confirm whether Maeve ever received treatment in California.

### E. Termination Order And Appeal

The court issued an order terminating Maeve's parental rights to Dov. It found Dov was a child in need of aid due to Maeve having placed him at substantial risk of physical harm[12] and due to the substantial risk of harm associated with Maeve's substance abuse.[13] The court further found that Maeve had not remedied her conduct causing Dov to be a child in need of aid and determined that if he were returned to her care, Dov would likely suffer substantial harm due to Maeve's continued abuse of illicit substances and her failure to complete treatment. The court concluded that OCS made reasonable efforts to reunite the family and that it was in Dov's best interests to terminate Maeve's parental rights.

Maeve appeals.

---

[12]   AS 47.10.011(6).

[13]   AS 47.10.011(10).

## III. STANDARD OF REVIEW

"Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact."[14] "When reviewing mixed questions of law and fact, we review factual questions under the clearly erroneous standard and legal questions using our independent judgment."[15] "A superior court's findings regarding . . . whether termination of parental rights is in the child's best interests [is a] factual question[] that we review for clear error."[16] "Conflicting evidence is generally not sufficient to overturn a trial court's factual findings, and we will not reweigh evidence when the record provides clear support for a trial court's ruling."[17] "Factual findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[18]

## IV. DISCUSSION

### A. The Court Did Not Err In Determining That OCS Made Reasonable Efforts.

OCS is required to "make timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family

---

[14] *Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 332 P.3d 1268, 1273-74 (Alaska 2014) (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.* (*Sherman B. I*), 290 P.3d 421, 428 (Alaska 2012)).

[15] *Id.* at 1274 (quoting *Ben M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)).

[16] *Jimmy E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 529 P.3d 504, 512-13 (Alaska 2023) (citing *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.* (*Sherman B. II*), 310 P.3d 943, 948-49 (Alaska 2013)).

[17] *Shirley M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 342 P.3d 1233, 1239 (Alaska 2015) (quoting *Emma D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 322 P.3d 842, 849 (Alaska 2014)).

[18] *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1264 (Alaska 2014) (quoting *Sherman B. I*, 290 P.3d at 427-28).

home."[19]  "[E]ven if the outlook is bleak and the likelihood of success is low, the State has an obligation to provide" reasonable efforts; "this obligation persists because 'terminating parental rights is a drastic measure,' as we must always bear in mind."[20] "[C]ourts must 'identify the problem that caused the [child] to be in need of aid' and then evaluate whether OCS made remedial 'efforts to assist the parent in remedying the conditions that led to finding the child in need of aid' and ensure those efforts were 'specifically designed to prevent the breakup of the . . . family.' "[21]

We "consider[] reunification efforts in their entirety when reviewing whether OCS made reasonable efforts."[22]  OCS "has some discretion in determining what efforts to pursue and whether the timing is reasonable."[23]  The reasonable efforts requirement does not require perfection and it "should not unduly prolong and unnecessarily burden a child's need for permanency."[24]

Here the court concluded OCS made reasonable efforts to provide rehabilitative services to Maeve because OCS arranged treatment at several dual-

---

**19**     AS 47.10.086(a).

**20**     *Kylie L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 407 P.3d 442, 448 (Alaska 2017) (first citing AS 47.10.086(a); and then quoting *Christina J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 254 P.3d 1095, 1104 (Alaska 2011)).

**21**     *Id.* at 449 (second alteration in original) (quoting *Josh L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 276 P.3d 457, 468 (Alaska 2012) (Winfree, J., dissenting)).

**22**     *Doug Y. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 243 P.3d 217, 226 (Alaska 2010) (citing *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1262 (Alaska 2010)).

**23**     *Sean B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 251 P.3d 330, 338 (Alaska 2011) (citing *Jeff A.C., Jr. v. State*, 117 P.3d 697, 706 (Alaska 2005)).

**24**     *Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 332 P.3d 1268, 1277 (Alaska 2014).

diagnosis treatment facilities that would allow her children to come with her, and it referred Maeve to drug testing.[25] The court observed that Maeve refused many of the efforts OCS offered.

Maeve argues OCS's efforts to reunify the family "were not timely or reasonable." Maeve claims OCS knew about her mental health needs early in the case but failed to implement or propose services to address her mental health needs within the first two years of the case. Maeve acknowledges that OCS referred her for a psychological evaluation, but she critiques this evaluation as focused on gathering evidence in support of termination. After reviewing the record, we are not persuaded by Maeve's arguments.

Contrary to Maeve's claims that OCS failed to identify her mental health challenges and need for mental health treatment until late in the case, the record establishes that OCS repeatedly offered services to meet her mental health needs.[26] In May 2020 the caseworker referred Maeve for a substance abuse assessment, and in June Maeve completed a psychosocial assessment. The assessment noted Maeve's borderline personality disorder diagnosis and recommended individual therapy along with substance abuse education. While OCS's referral sought only a substance abuse assessment, the assessment was comprehensive in identifying both Maeve's mental health and substance abuse issues. After this assessment Maeve was offered therapy to address her mental health needs, but she attended only sporadically.

---

[25]     We observe it is difficult to assess OCS's "efforts retrospectively over a period of many years, and an approach involving more regular review . . . increase[s] the likelihood that problems can be timely resolved and disagreements mitigated — goals all parties should share." *See Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 564 (Alaska 2022). Here we commend the superior court for making regular reasonable efforts findings at numerous hearings and in its termination order.

[26]     *See Doug Y.*, 243 P.3d at 226 (considering entirety of record in assessing reasonable efforts).

Furthermore, in February 2021 the caseworker developed a case plan with goals related to Maeve's substance abuse and mental health needs. Consistent with the case plan, OCS referred Maeve for a psychological evaluation in March. While the evaluation did not occur until July, this was not due to inaction by OCS. Rather, Maeve asked to reschedule the evaluation and then missed her new appointment. Aware of Maeve's borderline personality disorder diagnosis, the psychologist encouraged Maeve to participate in individual therapy in the meantime, but Maeve refused. The psychologist's assessment referred Maeve to individual therapy and acknowledged her borderline personality disorder diagnosis. She also recommended that Maeve participate in a treatment program to address both her substance abuse and mental health challenges. Thereafter OCS referred Maeve to four different dual-diagnosis inpatient treatment programs so that she could receive treatment related to both her substance abuse and her mental health needs. And even though Maeve left against medical advice or was discharged for nonparticipation from each of these programs, OCS continued to provide her additional referrals to address her substance abuse and mental health issues.

OCS also focused on Maeve's significant substance abuse challenges through numerous case plans, drug testing referrals, and substance abuse assessments. OCS appropriately exercised its discretion to focus on the substance abuse issue early in the case because that was the safety risk most directly related to Dov's removal following his positive tests for methamphetamine.[27]

OCS additionally provided extensive efforts to keep Dov with Maeve. From March through November 2020 OCS developed ten in-home safety plans and one out-of-home safety plan to try to keep Dov in Maeve's care. OCS referred Maeve to

---

[27] *See Sean B.*, 251 P.3d at 338 (noting OCS's discretion in its reasonable efforts); *Kylie L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 407 P.3d 442, 448-49 (Alaska 2017) (explaining court should evaluate whether OCS made reasonable efforts to help parent remedy condition that led to child being in need of aid).

three different inpatient treatment facilities that would allow virtual visits with Dov during detox and trial home visits after she stabilized. But these trial home visits did not occur because Maeve either did not enter treatment, left against medical advice, or was discharged for nonparticipation.

OCS provided a multitude of other efforts to reunify Maeve and Dov. It facilitated weekly visitation between Dov and Maeve. It also referred Maeve for a parenting risk assessment and parenting classes. But Maeve was eventually discharged from parenting classes after a series of no-shows. Throughout the case OCS regularly developed numerous individual case plans, family case plans, and case plan evaluations for Maeve and the family. OCS facilitated visits between Dov and his older siblings and grandparents. It also assisted with arranging necessary services for Dov, including speech therapy, physical therapy, audiology appointments, and urology appointments.

Although it is possible that OCS could have prioritized Maeve's mental health needs earlier, the record establishes that OCS made numerous efforts to assist Maeve with her mental health challenges and that, overall, OCS made extensive efforts to help her remedy the safety risks that caused Dov's removal. The superior court did not err in concluding that OCS made reasonable efforts to reunify Maeve and Dov.

### B. The Court Did Not Clearly Err In Finding That Termination Was In Dov's Best Interests.

Before the court terminates parental rights, OCS has the burden to prove "by a preponderance of the evidence that termination of parental rights is in the best interests of the child."[28] The best interests analysis is capacious and fundamental to CINA proceedings.[29] Alaska Statute 47.10.088(b) provides non-exhaustive factors

---

[28] CINA Rule 18(c)(3).

[29] *Miranda T. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 524 P.3d 1105, 1116 (Alaska 2023); *Jimmy E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 529 P.3d 504, 523 (Alaska 2023).

"that 'the court *may* consider'. . . ; it does not create a duty for the court to do so."[30] And the court may consider the parent-child bond in its best interests analysis.[31]

Maeve argues that, in analyzing Dov's best interests, the court placed too much emphasis on Maeve's addiction and not enough emphasis on her progress. She points out that shortly before the termination trial, OCS had planned to place Dov with her after she stabilized in inpatient treatment. She contends the court too quickly discounted her mental health therapist's testimony that she was working on her mental health and improving. She claims the court should have more carefully considered the testimony from various OCS caseworkers that Maeve was an exemplary and loving parent.

As an initial matter, we note that in finding that Dov's best interests would be served by termination of Maeve's parental rights, the superior court cited and analyzed the factors related to determining a child's best interests in the child custody context,[32] rather than directly citing the factors identified in the CINA statutes.[33] The court determined most of the custody best interest factors favored termination, except the factors related to "the love and affection existing between the child and [the] parent"[34] and Dov's preference. The court acknowledged credible testimony characterizing Maeve and Dov's relationship as loving and indicating that Maeve had attended most of her visits with Dov. In analyzing the factors that favored termination,

---

[30]    *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1167 (Alaska 2016) (emphasis in original) (quoting AS 47.10.088(b)).

[31]    *See Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 186-87 (Alaska 2008).

[32]    *See* AS 25.24.150(c) (outlining factors to determine child custody based on child's best interests).

[33]    *See* AS 47.10.088(b) (outlining factors to determine best interests in child in need of aid proceedings).

[34]    AS 25.24.150(c)(4).

the court detailed how Maeve's continuing substance abuse caused her to be unable to care for Dov and threatened Dov's safety. The court decided that Maeve's history of drug abuse and Dov's drug exposures along with Maeve's repeated failed attempts at substance abuse and mental health treatment, and inability to accept other forms of help or rehabilitation, favored termination.

Although the court structured its best interests analysis somewhat awkwardly in examining the child custody best interest factors, its findings regarding Dov's best interests were ultimately relevant and decisive in the context of this CINA case.[35] Although framed within the structure of the child custody factors, the court's analysis included numerous findings related to Maeve's addiction, her history of repeated failed treatment attempts, her lack of progress in addressing her addiction and related challenges, and the related impacts on Dov. In making those findings, the court necessarily considered factors such as the probability that Dov would be exposed to harm if returned to Maeve, Maeve's inability to mitigate her harmful conduct, her lack of progress in remedying safety risks to Dov, and the likelihood — or lack thereof — that Dov could be returned to Maeve's care in the foreseeable future if Maeve's parental rights remained intact.[36]

---

[35] *See Joy B.*, 382 P.3d at 1167-68 (affirming best interest analysis where court did not cite AS 47.10.088 factors but "ma[de] factual findings relevant to several of these factors").

[36] *See* AS 47.10.088(b) ("(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs; (2) the amount of effort by the parent to remedy the conduct or the conditions in the home; (3) the harm caused to the child; (4) the likelihood that the harmful conduct will continue; and (5) the history of conduct by or conditions created by the parent.").

Contrary to Maeve's argument, the court weighed a myriad of evidence related to her progress, or lack thereof, in conducting its best interests analysis.[37] The court weighed Maeve's record of being discharged from numerous treatment facilities and highlighted that it did not expect Maeve to be in a place to care for Dov in the foreseeable future.[38] Although OCS repeatedly considered placing Dov with Maeve if she would enter and stabilize in inpatient treatment, she repeatedly refused to enter, left, or was discharged for nonparticipation from those inpatient settings.

The court also appropriately considered and weighed witness testimony in analyzing Dov's best interests.[39] While Maeve's therapist expressed more hope for Maeve's prognosis and initially lauded her progress in treatment, the therapist ultimately acknowledged, when confronted with additional information, that Maeve likely was not ready to change. The court weighed the therapist's testimony that evolved over the course of the trial and Maeve's history of leaving treatment and relapsing, and found the therapist's testimony not credible. The court also heard and considered the testimony by OCS caseworkers about Maeve's strong parenting skills and loving relationship with Dov, but the court weighed this evidence against other

---

[37]     *See Jimmy E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 529 P.3d 504, 523 (Alaska 2023) (holding best interests analysis "require[s] a comprehensive judgment as to whether the child's best interests favor the termination of parental rights" (alteration in original) (quoting *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 186 (Alaska 2008))).

[38]     *See id.* ("Here, the superior court's best interests determination emphasized the great unlikelihood that [the mother] would be able to remedy her substance abuse within a reasonable time frame and the resulting likelihood that the harm to the children would continue unabated. These concerns, and the court's related findings, are well supported by the record.").

[39]     *See Shirley M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 342 P.3d 1233, 1239 (Alaska 2015) ("[W]e will not reweigh evidence when the record provides clear support for a trial court's ruling." (quoting *Emma D. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 322 P.3d 842, 849 (Alaska 2014))).

factors, like her continued struggles with addiction and Dov's need for permanency.[40] The court observed, "To find permanency with the mother, based on her past history over the last two years, may be many years down the road, if ever. To delay the child's permanency any long[er] would be to reject his permanency altogether." These findings are well supported in the record, and the court did not clearly err in finding that termination of Maeve's parental rights was in Dov's best interests.

## V. CONCLUSION

We AFFIRM the termination order.

---

[40] *See Dena M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 755, 763 (Alaska 2019) (affirming termination of parental rights despite positive benefits of parental connection when there was "no hope that either parent could be made capable of parenting either child at any time in the foreseeable future"); *Joy B.*, 382 P.3d at 1167 (concluding mother's bond with daughters insufficient to overturn superior court's best interests finding (citing *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1270-71 (Alaska 2014)).