*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JIMMY E., | ) |
| | ) Supreme Court Nos. S-18479/18480 |
| Appellant, | ) (Consolidated) |
| | ) |
| v. | ) Superior Court No. |
| | ) 3PA-20-00030/00102 CN |
| STATE OF ALASKA, DEPARTMENT | ) (Consolidated) |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S | ) O P I N I O N |
| SERVICES, | ) |
| | ) No. 7653 – May 12, 2023 |
| Appellee. | ) |
| | ) |
| ALLIE P., | ) |
| | ) |
| | ) Superior Court No. |
| Appellant, | ) 3PA-20-00100/00101/00030/00102 CN |
| | ) (Consolidated) |
| v. | ) |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) |
| OF HEALTH & SOCIAL SERVICES, | ) |
| OFFICE OF CHILDREN'S | ) |
| SERVICES, | ) |
| | ) |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Jonathan A. Woodman, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant Jimmy E. Chris Peloso, Peloso Law, Juneau, for Appellant Allie P. Laura Wolff, Assistant Attorney General,

Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, Carney, Borghesan, and Henderson, Justices. [Pate, J., not participating.]

HENDERSON, Justice.

## I. INTRODUCTION

The mother of four children and the father of the two youngest of those children challenge the termination of their parental rights. The father claims Alaska Native heritage and contends that his children are Indian children under the Indian Child Welfare Act (ICWA). The parents argue that the father provided the parties and the superior court a sufficient reason to know his two children are Indian children under ICWA and that the Office of Children's Services (OCS) failed to conduct the required diligent inquiry based upon the information he provided. The mother raises additional arguments related to the termination of her rights as to her two older children.

We hold that the father did provide a sufficient reason to know that the two youngest children are Indian children and that OCS did not conduct a sufficient inquiry. We therefore vacate the termination of the parents' rights as to the two youngest children and remand for further proceedings. We reject the mother's additional challenges and thus affirm the court's order terminating the mother's parental rights with respect to her two older children.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Family history

Allie P. and Jimmy E. had two children together: Ulysses E., now three years old, and Tamera E., now seven years old.[1] Allie also had two children with Jeff M.: Martha M., now 15, and George M., now 12.[2]

Allie has a history of substance abuse and related OCS involvement. After a period of sobriety beginning in 2012, she relapsed in 2016, around the time the three eldest children were initially removed from her home. A hair follicle test for Tamera in 2016 was positive for amphetamine and methamphetamine. That initial OCS case ultimately resulted in Jimmy and Allie agreeing to the children's placement in a guardianship with Allie's mother. In June 2018, both Allie and Jimmy entered a methadone treatment program for opioid addiction.

#### 2. Removal of Ulysses and termination of the guardianship

Ulysses was born in September 2019. Shortly thereafter, OCS received reports that the baby was exposed to drugs and domestic violence in the home and began investigating the family in November and December. In February 2020, OCS filed a non-emergency petition and took Ulysses into its custody. In mid-February 2020, a court-ordered hair follicle test showed the presence of methamphetamine, amphetamine, and marijuana in the baby's hair. Allie and Jimmy submitted to OCS urinalyses that month and tested positive for methamphetamine, amphetamine, and marijuana.

---

[1]     We use pseudonyms in this opinion to protect the privacy of the family members.

[2]     Jeff M. relinquished his parental rights to Martha in October 2021 and consented to George's adoption. He is not participating in this appeal.

At that time, Allie's mother was still the legal guardian of Tamera, Martha, and George. During spring 2020 OCS became increasingly concerned about the guardianship of the older children. The agency received and investigated reports that Allie's mother exposed the children to domestic violence in her home and allowed unsupervised contact between the children and Allie and Jimmy. OCS filed an emergency petition for custody of those children in June 2020.

OCS created individualized case plans for Allie and Jimmy, directing both parents to undergo substance abuse and domestic violence assessments and follow the resulting recommendations; participate in random drug testing at an OCS approved facility; and engage in parenting classes and family contact. OCS also instructed the parents to continue participating in their current methadone treatment program.

### 3. The parents' continued substance abuse

Neither Allie nor Jimmy demonstrated any progress in addressing their substance abuse. The parents did not attend OCS scheduled drug testing from March to September 2020. The record does not indicate whether OCS scheduled any drug tests after that date.

While the parents received some treatment from the methadone clinic they attended, they did not provide releases of information that would allow OCS to access their treatment records and requested instead that the clinic send letters confirming only their participation in treatment. Following a court order, the clinic eventually provided records spanning from June 2018 to April 2021 for both parents. The records confirmed that the parents consistently received their methadone doses during that time. But the records also demonstrated that the parents abused substances during that period. Urinalysis results showed that both parents used illegal drugs while Allie was pregnant, in the months after Ulysses's birth, and into April 2021. Allie tested positive for amphetamine, opioids, and marijuana consistently throughout treatment. Additionally Allie refused to test on multiple instances in 2020 and 2021. Jimmy also consistently tested positive for amphetamine and opioids and refused to test several times in 2020

and 2021. Jimmy and Allie were also reportedly hostile to clinic staff and occasionally missed counseling appointments.

### 4. Martha's runaway status

After OCS reassumed custody of the older children in June 2020, Martha frequently ran away from her foster home. Throughout most of the CINA proceedings, OCS reported that Martha was in "runaway" status.

In November 2020, law enforcement officers stopped a vehicle Jimmy was driving with Allie in the passenger seat and Martha in the backseat. The officers were investigating an allegation of shoplifting at a local store. Allie was uncooperative and refused to give the officers Martha's name, but Jimmy eventually provided it. When officers searched the car, they found the stolen merchandise. They also found heroin, methamphetamine, marijuana, and drug paraphernalia in Allie's purse. Allie was later charged with drug possession, theft, and trespass.

OCS caseworkers and law enforcement officers also later testified about several incidents in 2021, when they found Martha with her parents or otherwise evading OCS. In June 2021, for example, Martha ran away from her foster home, and OCS caseworkers heard she was staying with her mother. Caseworkers subsequently found Allie and Martha together and tried to convince Martha to come back with them, but Allie told Martha to get in a car with her and they drove away.

Just two months later, in August 2021, Wasilla Middle School notified OCS that Allie had registered Martha for school there. OCS caseworkers visited Martha and tried to convince her to return with them to her foster home. Martha called Allie during this interaction, and one caseworker could hear Allie's voice over the phone telling Martha to not cooperate with OCS and saying the OCS workers were liars.

On four other occasions, law enforcement officers responded to incidents involving Martha. In August 2021 a trooper found Martha in a stolen car. Allie arrived and identified herself as Martha's mother, but did not inform the officers that Martha was in OCS custody. Martha left the scene with Allie. In September 2021 officers

visited Allie and Jimmy's home, after a report from OCS that a girl matching Martha's description had been seen running from their home and going to a neighbor's house for help. Allie refused to let the officers in and told them she did not know where Martha was. In December 2021 officers found Martha hiding in a motel room after reports of a disturbance involving a man, woman, and female child. Officers took Martha to the OCS office.

Finally, just weeks before the termination trial started, officers detained Martha after she had gotten into a fight. An involved officer informed OCS that Martha appeared to be under the influence and they had found her in a home with empty alcohol bottles and found marijuana and associated paraphernalia in her purse. She was "stumbling and staggering" while she was trying to walk into the OCS office. Martha slept for a few hours in the OCS office and then left.

### B. Proceedings

#### 1. Initial ICWA inquiries

At the outset of these CINA proceedings, the parties proceeded as if ICWA may apply to Tamera and Ulysses based on Jimmy's possible tribal affiliation.[3] When OCS first filed its non-emergency petition for custody of Ulysses, it noted that Jimmy's tribal affiliation was "unknown." Later in June 2020, when OCS removed the other three children from the guardianship, it indicated Jimmy's tribal affiliation as potentially with Nome Eskimo Community.

In February 2020, OCS sent inquiry letters to the Alaska Regional Director of the Bureau of Indian Affairs (BIA), Tanana Chiefs Conference, and Nome Eskimo Community, notifying them that Ulysses may be an Indian child. Each letter listed the parents' and Ulysses's names and birthdates. The letter also included Allie's

---

[3] There is no indication that either Jeff M. or Allie is affiliated with any tribe. Therefore, the ICWA inquiries were only focused on Jimmy's children, Tamera and Ulysses.

parents' names and birthdates, but listed Jimmy's parents as unknown. In June 2020 OCS sent a similar communication to the BIA, Tanana Chiefs Conference, and Nome Eskimo Community regarding Tamera's potential status as an Indian child.

At the emergency probable cause hearing in June 2020, OCS told the court that Tamera "may be ICWA" because of Jimmy's potential affiliation with Nome. At an August status hearing, OCS reported that the ICWA inquiry had come back negative from Nome for Ulysses, and therefore "it wouldn't be for [Tamera] either." Nome's response is not in the record. Jimmy insisted that his children are Native, and that Tamera was "registered" and Ulysses was eligible to be registered.

In September 2020, OCS reported that it was "still trying to establish whether or not this is actually ICWA." After the Nome Eskimo Community reported that the children were not members, OCS investigated "another potential tribe." During these hearings neither Jimmy nor his attorney corrected OCS when it reported contacting the Nome Eskimo Community. Throughout the fall of 2020, the court indicated that ICWA "may" apply to Ulysses and Tamera.

### 2. Contested probable cause hearing

The court held a contested probable cause hearing in February 2021. There, the court heard testimony about the parents' drug use and criminal activity since the children were removed. Three OCS employees also testified about the status of the reunification efforts and reported that the parents were not willing to engage in their case plans except for visitation.

The court and parties once again addressed ICWA during this probable cause hearing. The superior court asked whether ICWA applied. OCS told the court that after initial research, the "checks were run again where [OCS was] told to" and it researched Tamera's file. OCS reported that it did not find that any of the children were Indian children.

Jimmy interjected, telling the court that the "children are most definitely [ICWA]" because he was "one-eighth Native" and the children "fit the criteria" for

enrollment eligibility in a tribe. The court asked Jimmy if he was a tribal member, and he responded that he was not. But Jimmy insisted that his children were eligible to be enrolled and further stated that he is a Cook Inlet Region, Incorporated (CIRI) descendant through his mother.

The court explained to Jimmy that ICWA only applied to his children if they were enrolled in a tribe, or if he was enrolled and they were eligible to be enrolled. After this exchange the court found that ICWA did not apply and that there was probable cause to believe that all four children were in need of aid.

### 3. Further proceedings and termination trial

At a permanency hearing and pretrial conference in March 2021, OCS informed the court it was planning to file a termination petition in the near future. The court wanted to ensure that the parents understood what they could do to prevent this, so the court directed OCS to read the specifics of each case plan aloud during the hearing. Allie objected to many aspects of the plan, arguing OCS was not allowed to dictate her provider or require her to participate in treatment outside the methadone clinic, but the court explained to Allie the importance of using the recommended providers, participating in the case plan, and releasing information to OCS. Jimmy was present at this hearing but did not comment on the case plan.

In May 2021, OCS filed a termination petition as to all four children. Relevant to this appeal, the petition alleged that the children were in need of aid due to abandonment and substance abuse.[4] The superior court held a combined adjudication and termination trial in early 2022.

At trial the court heard the testimony of law enforcement officers describing Martha's runaway status. The court also heard from the caseworker who had worked with the family the longest, who testified extensively about the family and

---

[4]     AS 47.10.011(1), (10).

her efforts to provide services. She described her challenges reaching the parents to discuss case planning, including that every conversation she had with Allie about case planning "devolved into screaming" and that Jimmy was hard to reach but "more cooperative." Because of these difficulties, caseworkers had to create and update case plans without the parents' input. The caseworker further testified that neither parent had made any progress on completing their case plans, aside from consistently participating in visitation.

The caseworker also indicated that she had emailed Jimmy in August 2021 asking to "get together and work on getting . . . his kids Certificate of Degree of Indian Blood [CID's] because he had mentioned that they were Alaska Native."[5] The OCS caseworker did not remember Jimmy replying, and it was unclear whether Jimmy had attempted to reply by email.

Allie did not testify at the termination trial. Jimmy testified on the last day about OCS's efforts and his sobriety. Jimmy claimed that he had never received a copy of the case plan, not even by email. He also testified that even though his phone was always working, OCS only called him once and they would call Allie instead.

On June 28, 2022, before closing arguments, Jimmy's attorney again raised the issue of whether ICWA applied. Jimmy's counsel asked that Jimmy be able to testify that his mother is a CIRI shareholder, he receives medical care at Alaska Native Medical Center (ANMC), and his children are also eligible to register and receive ANMC services. The attorney pointed to the fact that Jimmy receives primary

---

[5] A Certificate of Degree of Indian or Alaska Native Blood is issued by the Bureau of Indian Affairs, based on descent from family members who were enrolled members of federally recognized tribes. *See* U.S. DEP'T OF THE INTERIOR, BUREAU OF INDIAN AFFS., *Request for Certificate of Degree of Indian or Alaska Native Blood,* https://www.bia.gov/sites/default/files/dup/assets/public/raca/online_forms/pdf/1076-0153_CDIB%20Form_Expires%2011.30.2024_508.pdf.

care from ANMC and that OCS was on notice of this fact through his methadone clinic records as of April 2021. Jimmy's attorney further argued that because Jimmy received services at ANMC, he either had to have a CID or be a member of a tribe.

The superior court determined that this information did not show that the children were Indian children under ICWA because it did not tend to establish that Jimmy was an enrolled member of a tribe or that the children were enrolled or eligible to be members of a tribe. Citing *Bruce L. v. W.E.*,[6] the superior court further concluded that Jimmy was responsible for coming forward with evidence that ICWA applies and that it was not error to ignore ICWA's mandates in the absence of such evidence. Jimmy continued to argue that ICWA applied, but the court reiterated its conclusion that the children were not Indian children under the statute.

### 4. Superior court's ruling

The superior court terminated Allie's and Jimmy's parental rights. The court first stated that none of the children in the case were Indian children as defined by ICWA because no party had argued the children were members of a tribe and Jimmy had only argued that he was eligible for membership in an unknown tribe. The court further noted that Jimmy never argued that either he or his children were enrolled in a tribe. The court determined that OCS had no duty to investigate when no party has come forward with evidence that ICWA applied. To the extent there was any duty to investigate or provide notice in this case, the court held that OCS had fulfilled that duty.

The superior court further found that the children were in need of aid due to abandonment and substance abuse. Related to substance abuse, the court emphasized the parents' many positive drug tests through the methadone clinic. The court also found that neither of the parents had made any progress whatsoever on his or her case

---

[6]     247 P.3d 966, 977 (Alaska 2011) ("Other courts have held that if the requisite party does not come forward with evidence that ICWA applies, it is not error to ignore ICWA's mandates.").

plans, meaningfully engaged in services that OCS referred them to, or cooperated with OCS to demonstrate any period of sobriety, and therefore that neither parent had remedied their substance abuse. The court further determined that OCS's efforts were reasonable in this case, emphasizing OCS's continued efforts to communicate with the parents despite the parents' continued refusal to participate in case planning.

Finally, the superior court found that it was in the children's best interests to terminate Jimmy's and Allie's parental rights. Martha argued at trial that it was not in her best interests because terminating Allie's rights at this time would leave her "essentially an orphan." The superior court did not find this argument persuasive, noting that terminating Allie's rights gave OCS a better chance at finding Martha a permanent placement that was acceptable to her and that would protect her from further exposure to substance abuse.

The parents appeal.

## III. STANDARD OF REVIEW

Interpreting ICWA and BIA regulations presents questions of law that we review using our independent judgment.[7] Whether the superior court's CINA findings satisfy the applicable statutes is also a question of law.[8]

A superior court's findings regarding whether a child is in need of aid, whether the parents have remedied their conduct, and whether termination of parental rights is in the child's best interests are factual questions that we review for clear error.[9] "Findings of fact are clearly erroneous if a review of the entire record in the light most

---

[7] *State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999, 1008 (Alaska 2022).

[8] *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 310 P.3d 943, 949 (Alaska 2013).

[9] *Id.* at 948-49.

favorable to the prevailing party below leaves us with a definite and firm conviction that a mistake has been made."[10]

Whether OCS made reasonable reunification efforts toward a family is a mixed question of law and fact.[11] We review factual questions under the clearly erroneous standard and legal questions using our independent judgment.[12]

## IV. DISCUSSION

### A. Jimmy Gave OCS A Reason To Know The Children Are Indian Children And OCS Did Not Inquire With Sufficient Diligence.

First, we hold that Jimmy provided OCS a "reason to know" that his children are Indian children when he informed OCS of specific Native heritage, indicated that one of the children was "registered" and the other was eligible to be registered, and provided the additional information that his mother was a CIRI shareholder. Second, we hold that the superior court erred in failing to confirm whether OCS exercised due diligence in investigating whether ICWA applied. Because the record contains no information suggesting that OCS investigated some of the updated and specific information provided by Jimmy, the court could not have confirmed a diligent inquiry by OCS.

#### 1. ICWA requires state agencies to provide notice and inquire with potentially involved tribes when a party provides a "reason to know" a child is an Indian child.

ICWA provides protections for Indian children and tribes in child custody proceedings. An Indian child is defined as either "a member of an Indian tribe" or "eligible for membership in an Indian tribe and . . . the biological child of a member of

---

[10] *Id*. at 949.

[11] *Id.*

[12] *Id.*

an Indian tribe."[13]  In any involuntary child custody proceeding, if a court "knows or has reason to know that an Indian child is involved," the party seeking the termination of parental rights to an Indian child must notify the Indian child's tribe or the potential tribe.[14]

Federal regulations require that, at the beginning of an involuntary custody proceeding, the court must ask whether any participant "knows or has reason to know that the child is an Indian child."[15]  The regulations also contemplate that information relating to a child's tribal status may become apparent later in the case and instruct courts to tell parties to come forward with any subsequent information gained.[16]

Federal regulations define six instances in which the court has "reason to know" a child is an Indian child.[17]  One instance is when "[a]ny participant . . . informs the court that it has discovered information indicating that the child is an Indian child."[18]  If there is reason to know, but the court does not have sufficient evidence to determine whether the child is an Indian child, the party seeking termination of parental rights must use "due diligence to identify and work with all of the Tribes of which there is reason to know the child may be a member" or eligible for membership.[19]  "[U]nless

---

[13]  25 U.S.C. § 1903(4).  The statute also requires that an Indian child must be under 18 and unmarried.

[14]  *Id.* § 1912(a); Indian Child Welfare Act Proceedings, 25 C.F.R. § 23.111(b) (2023).

[15]  25 C.F.R. § 23.107(a).

[16]  *Id.*

[17]  *Id.* § 23.107(c).

[18]  *Id.* § 23.107(c)(2).

[19]  *Id.* § 23.107(b)(1).

and until it is determined on the record that the child does not meet the definition of an 'Indian child,' " the court must treat the child as an Indian child.[20]

If there is reason to know a child is an Indian child, but the identity of the tribe cannot be ascertained, the agency must send notice to the regional BIA director.[21] The notice must include "as much information as is known regarding the child's direct lineal ancestors."[22] The BIA cannot make a determination of tribal membership but can identify tribes to contact.[23] Additionally, if a tribe does not respond to a state agency, the agency must contact the BIA for assistance.[24]

The regulations provide specific guidelines for what an agency must include in the notice it sends to tribes and the BIA. The notice must include, in plain language, information about the child's birthdate, the parents' birthdates, and, "[i]f known, the names, birthdates, birthplaces, and Tribal enrollment of other direct lineal ancestors of the child, such as grandparents."[25] The notice must include a statement of the rights of the tribe if the child is a member.[26]

The BIA guidelines recommend that an agency provide as much information as possible in notices.[27] This information can aid tribes in determining

---

[20]    *Id.* § 23.107(b)(2).

[21]    *Id.* § 23.111(e).

[22]    *Id.*

[23]    *Id.*

[24]    *Id.* § 23.105(c).

[25]    *Id.* § 23.111(d)(1)-(3).

[26]    *Id.* § 23.111(d)(6)(iii).

[27]    U.S. DEP'T OF THE INTERIOR, BUREAU OF INDIAN AFFS., GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 21 (2016), https://www.bia.gov/sites/default/files/dup/assets/bia/ois/pdf/idc2-056831.pdf [hereinafter BIA GUIDELINES].

whether the child is a member, decreasing the likelihood of any delay or future disruption.[28] Among other things, the BIA recommends that agencies provide ancestry or family charts for both parents and the current addresses of the parents and any extended family.[29]

The tribe makes the determination whether the child is a member, or whether the child is eligible for membership and the biological parent is a member.[30] But per the BIA guidelines, "the court must ultimately determine whether the child is an Indian child for purposes of the child-custody proceeding."[31] Ideally this determination is based on information from the potentially involved tribes.[32] If a tribe does not respond, the BIA recommends that the court only make a decision after an agency has made multiple requests for a response and sought the assistance of the BIA.[33] This is because without a proper inquiry, the court cannot accurately determine whether ICWA applies.[34] The court must confirm, with "a report, declaration, or testimony included in the record," that the agency pursuing the custodial action used due diligence to identify the child's potential tribe.[35]

---

This court has recognized that BIA guidelines are important and persuasive, but not controlling. *See Bruce L. v. W.E.*, 247 P.3d 966, 975 n.22 (Alaska 2011).

[28]    BIA GUIDELINES, *supra* note 27, at 21.

[29]    *Id.*

[30]    25 C.F.R. § 23.108(a).

[31]    BIA GUIDELINES, *supra* note 27, at 22.

[32]    *Id.*

[33]    *Id.*; *see In re D.J.*, 862 S.E.2d 766, 772-73 (N.C. 2021).

[34]    *In re D.E.*, 168 N.E.3d 111, 128-29 (Ohio. App. 2021).

[35]    25 C.F.R. § 23.107(b)(1).

## 2. Jimmy provided OCS and the court a reason to know his children are Indian children.

We have not yet considered what constitutes a "reason to know" sufficient to trigger the duty to conduct a due diligence inquiry into whether a child is an Indian child for purposes of ICWA. Other state courts have addressed this issue, and their reasoning is helpful. We recognize a vague assertion of Native heritage is not a reason to know a child is an Indian child. But in this case, Jimmy's more specific assertions — including his statement that he is a descendent of a CIRI shareholder, a specific Alaska Native Claims Settlement Act (ANCSA) corporation — constitute a reason to know that Jimmy's children are Indian children.

A "reason to know" is information that is more concrete than a "reason to believe,"[36] but it is inherently less definitive than when a court "knows" a child is an Indian child. Overall, determining what constitutes a "reason to know" involves analysis of a multitude of facts from the particular record in each case.[37] A "reason to know" must be specific enough to point to the fact that the parent or child is likely enrolled in a particular tribe and state courts generally agree that a "reason to know" is "more than a bare, vague, or equivocal assertion of possible Indian ancestry without reference to any identified Indian ancestors with a reasonably suspected tribal

---

[36] In drafting the implementing regulations, the BIA at one point proposed requiring states to inquire with tribes and courts to treat children as Indian children if they had "reason to believe" the child was an Indian child. Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,803 (June 14, 2016). The language in the final rule was changed to "reason to know" to ensure that the regulations were consistent with the statute and to address commenters' concerns that the language was overly broad. *Id.* at 38,803-04.

[37] *In re L.H.*, 492 P.3d 1218, 1224 (Mont. 2021).

connection."[38]  This is because status as an Indian child is a political designation:  it is based on the parent or child's enrollment in a tribe, not their race.[39]

But many tribes consider heritage or descent in determining a child's political affiliation with the tribe.[40]  In its thorough analysis of this issue, the Washington Supreme Court decided that a specific claim of Native ancestry can be a reason to know a child is an Indian child.[41]  First, the court explained that "the 'reason to know' standard covers situations where tribal membership is in question but is a possibility due to tribal heritage" and "[t]he final determination . . . must then be made by the tribe itself."[42]  That court emphasized that defining "reason to know" in this way

---

[38]  *Id.*; *In re C.C.G.*, 868 S.E.2d 38, 43-44 (N.C. 2022) (holding reporting "Cherokee Indian Heritage" with nothing more not sufficient reason to know); *People in re E.A.M. v. D.R.M.*, 516 P.3d 924, 935 (Colo. 2022) (holding that parent's belief that they have Native ancestors not sufficient reason to know); *In re Jeremiah G.*, 92 Cal. Rptr. 3d 203, 208 (Cal. App. 2009) (holding an assertion that father "may have Indian in him" not sufficient reason to know).

[39]  *D.R.M.*, 516 P.3d at 935; *In re C.C.G.*, 868 S.E.2d at 44 ("Indian heritage, which is racial, cultural, or hereditary does not indicate Indian tribe membership, which is political.").  Indeed, if ICWA were to apply solely based on racial heritage, it would likely violate the Due Process Clause of the Fifth Amendment of the United States Constitution.  *See Morton v. Mancari*, 417 U.S. 535, 551-55 (1974) (holding that "[a]s long as the special treatment can be tied rationally to the fulfillment of Congress's unique obligation toward" tribes, such classifications do not violate due process); *see also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 11.06 n.19 (Nell Jessup Newton ed., 2019) (listing cases that uphold ICWA on the grounds laid out in *Morton* in challenges invoking equal protection).

[40]  Tommy Miller, Comment, *Beyond Blood Quantum:  The Legal and Political Implications of Expanding Tribal Enrollment*, 3 AM. INDIAN L.J. 323, 323 (2014) (describing range of approaches to tribal citizenship, including lineal descent, matrilineal descent, and Indian or tribal blood quantum).

[41]  *In re Z.J.G.*, 471 P.3d 853, 864-69 (Wash. 2020).

[42]  *Id.* at 866.

is integral to respecting tribal sovereignty, because the tribe has the exclusive authority to determine who is a member or eligible for membership.[43] Second, the court pointed to federal canons of statutory construction specific to Indian law, noting that "statutes are to be construed liberally in favor of" tribes.[44] The court further reasoned that applying an expansive definition of "reason to know" serves the purpose of ICWA to "guarantee due process to tribes so they have the opportunity to protect their sovereign interests" and intervene in child custody cases where an Indian child is involved.[45] The court ultimately determined that the trial court had reason to know that the children in that matter were Indian children because the mother claimed that she and the children were *eligible* to be enrolled in a tribe and because both parents had heritage connecting them with two other specific tribes.[46]

We consider the Washington Supreme Court's reasoning to be persuasive and note that other states also consider a specific, recent claim of Native heritage to be a "reason to know" the child is an Indian child.[47] Tribes have many methods to determine membership or eligibility for membership, including lineal descent or blood quantum.[48] Additionally, a tribe may enroll an eligible child after being notified by a

---

[43]    *Id.* at 865; *see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n.32 (1978) ("A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community.").

[44]    *In re Z.J.G.*, 471 P.3d at 866-867 (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)).

[45]    *Id.* at 867.

[46]    *Id.* at 870.

[47]    *In re N.D.*, 259 Cal. Rprt. 3d 826, 827-28 (Cal. App. 2020); *In re N.K.*, 851 S.E.2d 321, 335 (N.C. 2020); *In re K.S.*, 260 A.3d 387, 398 (Vt. 2021).

[48]    Miller, *supra* note 40, at 323.

state agency that the child is involved in a child custody proceeding.[49] Because the tribe as sovereign has exclusive power to determine tribal membership or eligibility for tribal membership, notifying the tribe when a child who may be a member is involved in a child custody proceeding is imperative to implementing ICWA's protections of tribes and tribal members.

Here, we note that it is unclear what information initially prompted OCS's early inquiry into whether ICWA applied. The record does not indicate what OCS and the other parties knew or what Jimmy had told OCS. OCS appears to have investigated affiliation with widely varying tribes early in the case. Later, Jimmy asserted in court that his children were either "registered" or eligible to be enrolled.[50] Whatever the information was, it appears that the parties and the court treated this information as a reason to know and took preliminary steps to inquire of and provide notice to the BIA and two tribal organizations.

In addition to this early information, Jimmy later specified to OCS and the court that he is a CIRI descendant through his mother. This statement gave OCS new information to act on. And paired with Jimmy's earlier representations pointing to tribal affiliation, Jimmy's new assertion gave OCS and the court additional reason to know that Jimmy's children are Indian children.

---

[49] *See In re Z.J.G.*, 471 P.3d at 858 (noting children's grandmother's tribe determined that the children were tribally enrolled after being contacted about the custody case); *State ex rel. Juv. Dep't of Lane Cnty. v. Tucker*, 710 P.2d 793, 797 (Or. App. 1985) (upholding Indian child status after Alaska Native village determined child was eligible for membership after a village council meeting).

[50] We decline to decide here whether those statements, on their own, would constitute a reason to know. But we note that the court could have found a "reason to know" with a simple inquiry based on Jimmy's statements: asking questions about his ancestry, whether his family is from a specific village, or even which tribe he thinks the children are eligible to be enrolled in.

OCS contends that one's status as an ANCSA shareholder is based solely on Native heritage and it does not indicate membership in a tribe because ANCSA corporations are not tribes. But this is not quite right. To become a shareholder in an ANCSA corporation, a person had to be "one-fourth degree or more Alaska Indian[,] . . . Eskimo, or Aleut blood, or combination thereof."[51] If there was no proof of blood quantum, a person "who is regarded as an Alaska Native by the Native village . . . [of which] he claims to be a member" and whose father or mother was regarded as Native by any village could also apply to become an ANCSA shareholder.[52] So, while ANCSA enrollment may be based on racial identity, it can *also* be based on membership in a Native village, which is relevant to determining whether a child is an Indian child.

Additionally, Jimmy's identification of his status as a CIRI descendant provided OCS with clearly discernible next steps for determining whether he or his children were members of a tribe within a particular region. The superior court and the parties were then on notice of Jimmy's potential affiliation with a tribe within the CIRI region. Logical next steps would have included asking for further information about Jimmy's mother, potentially contacting Jimmy's mother, providing notice (containing Jimmy's mother's identifying information) to tribes within the CIRI region, and providing this additional information to the BIA. Indeed, the ANCSA rolls are recent and well-documented proof of Native ancestry created in the 1970s, making Jimmy's

---

[51] 43 U.S.C. § 1602(b). Enrollment was initially limited to those born on or before December 18, 1971. 43 U.S.C. § 1604(a). Subsequent ANCSA amendments allowed corporations to re-open enrollment if shareholders agreed. 43 U.S.C. § 1606(g)(1)(B). While some Native corporations have re-opened enrollment, CIRI has not. *CIRI Shareholder Handbook*, COOK INLET REG'L CORP. 14-15 (Sept. 12, 2016), https://www.ciri.com/pdfs/forms/2023-Shareholder-handbook.pdf.

[52] 43 U.S.C. § 1602(b).

mother's affiliation significantly easier to identify than that of a more distant ancestor.[53] Although Jimmy's early statements and the parties' initial suggestions that ICWA applied to Jimmy's family may have been somewhat vague, Jimmy's further statement that he was a CIRI descendant through his mother gave the court and parties a particular reason to know the children are Indian children and that ICWA may apply.

In holding that ICWA did not apply to Allie and Jimmy's children, the superior court emphasized Jimmy's admission during an exchange at the end of a hearing that he was not an enrolled member of a tribe and that his children were eligible to be enrolled, but were not yet enrolled. It is true that ICWA does not apply where neither the parents nor the children are members of a tribe.[54] And certainly the information a parent provides about their own or their children's tribal affiliation is part of the inquiry into whether children are Indian children.

But Jimmy's statements in themselves are not determinative. First, the record reflects that Jimmy likely did not understand the details of his family's — including his children's — tribal affiliation, and did not appreciate the meaning of the terms that the parties and the court used in relation to ICWA. For example, Jimmy referenced one of the children being "registered" but later indicated the children were not already "members" of a tribe. Additionally, the court asked Jimmy specifically about a tribe, but in Alaska, recognized tribes are almost always

---

[53] *See Original Shareholder Enrollment (1971-1991)*, ANSCA REG'L ASS'N, https://ancsaregional.com/about-ancsa/#original-enrollment.

[54] 25 U.S.C. § 1903(4). *But see In re Z.J.G.*, 471 P.3d at 858 (involving tribe determining children were tribally enrolled after being contacted about custody case); *Tucker*, 710 P.2d at 797 (same).

named villages or Native communities.[55]  It is unclear whether Jimmy would have understood this.

Perhaps more importantly, treating a parent's uncertain statements as determinative in a context like this could undermine tribal sovereignty, because the tribe decides who is a member.[56]  It is a "basic federal rule" that tribes are the exclusive authority on their membership.[57]  We have previously held that absent a determination by a tribe, a child's membership or eligibility for membership in a tribe is likely not subject to judicial admission, recognizing the legal authority of tribes to determine membership.[58]  Giving too much weight to the statements of a party without proof or input from the tribe would undermine this fundamental principle.

The superior court also relied on our decision in *Bruce L.* for the proposition that if the person asserting ICWA should apply does not come forward with evidence that it does apply, it is not "error to ignore ICWA's mandates."[59]  But this reading of *Bruce L.* is erroneous.  In *Bruce L.*, the parties had not disputed the child's status as an Indian child throughout years of proceedings, but the superior court found

---

[55]    Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 88 Fed. Reg. 2112, 2115-16 (Jan. 12, 2023).

[56]    OCS also argues that because tribal membership is voluntary and typically requires an affirmative act, Jimmy's assertion that he is not a member and his children are only eligible means that there was no reason to know the children were Indian children.  This argument is unpersuasive for similar reasons:  giving too much credit to a parent's assertion undermines the tribe's sovereign ability to determine its own members and would not align with the purposes of ICWA.

[57]    *Bruce L. v. W.E.*, 247 P.3d 966, 975 n.22 (Alaska 2011) (quoting COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 11.02[2], at 827 (Nell Jessup Newton ed., 2005)).

[58]    *Id.* at 975-76.

[59]    *Id.* at 977.

otherwise without informing the parties.[60] We concluded that this decision, without notice to the parties and an opportunity to respond, was fundamentally unfair.[61] In reaching that conclusion, we noted that if the status *had been* disputed, it would have been the father's responsibility to put forth evidence that ICWA applied.[62] Here, the issue is not whether the status of the children was contested, but whether Jimmy put forth a reason to know that his children are Indian children sufficient to trigger the State's duty to conduct a due diligence inquiry into what tribes may have a right to be involved in the proceeding. We further note that *Bruce L.* was decided before the BIA enacted regulations requiring a due diligence inquiry on the part of the party seeking the involuntary termination.[63] Here, no party raised the BIA regulations before the superior court, and the court did not discuss them in determining that ICWA did not apply.

We reiterate that a "reason to know" that children are Indian children may arise in many different ways, based upon a multitude of different pieces of information, and determining whether there is a "reason to know" is a fact-intensive analysis requiring consideration of the record of information and context presented in any given case.[64] Here, Jimmy's specific claim that he is a recent descendant of a CIRI shareholder, paired with his early assertions related to his children's tribal affiliation, gave OCS and the court "reason to know" his children are Indian children, triggering

---

[60]    *Id.* at 976-77.

[61]    *Id.* at 977.

[62]    *Id*.

[63]    The current regulations went into effect in December 2016. Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,788, 38,788 (June 14, 2016) (establishing December effective date).

[64]    *In re L.H.*, 492 P.3d 1218, 1224 (Mont. 2021).

OCS's duty to inquire and to treat the children as Indian children pending a definitive answer as to their status.

> **3.  The court erred in concluding OCS met its due diligence obligation because the record does not demonstrate OCS followed through on its duty to inquire, investigate, and notify tribes and the BIA.**

Where there is a reason to know that ICWA applies, the court must confirm, through "a report, declaration, or testimony included in the record," that OCS used due diligence to identify and notify relevant tribes.[65] We have not previously addressed what constitutes "due diligence" under the federal regulations. However, BIA guidance and precedent from other states provide some assistance in defining due diligence in this context.[66]

First, Jimmy argues that the superior court failed to make the determination of due diligence based upon actual and adequate evidence. Jimmy contends the court should have taken sworn testimony from an OCS caseworker. The superior court relied on reports from OCS workers and OCS's attorney at various hearings that they had investigated whether this was an ICWA case. OCS also provided copies of the letters to the tribes and to the BIA and certified return mail receipts in the record, as required by the regulations.[67]

We disagree with Jimmy's contention that the court could only confirm the exercise of due diligence through sworn testimony. The BIA regulations only require that the court confirm the agency's due diligence through "a report, declaration,

---

[65]    25 C.F.R. § 23.107(b)(1).

[66]    *Bruce L.*, 247 P.3d at 975 n.22 (noting deference this court typically grants to BIA guidance as persuasive).

[67]    25 C.F.R. § 23.111(a)(2).

or testimony included in the record."[68] BIA Guidelines indicate only that the agency's efforts be "documented in the court record."[69] There is nothing that indicates that sworn testimony from an OCS caseworker would be necessary. The oral reports that the state's attorney gave the court throughout the pendency of the litigation appear to be the type of reports or declarations the regulations anticipate.

But the superior court must have sufficient information before it can confirm whether OCS used due diligence.[70] Here, we agree with Jimmy that OCS failed to provide sufficient information to confirm that it acted with due diligence in investigating whether Allie and Jimmy's children were Indian children. First, there is nothing in the record to suggest that OCS conducted any inquiry after Jimmy identified that his mother was a CIRI shareholder and second, the information that OCS provided regarding its initial inquiries is insufficient to establish whether the agency used due diligence.

There is no evidence in the record that OCS conducted any investigation, much less used due diligence, after Jimmy informed the court that his mother was a CIRI shareholder. At the beginning of the case, OCS told the court that there was reason to believe that Jimmy was affiliated with Nome. The record does not indicate why OCS thought Nome was the tribe and Jimmy did not contest this. In any event, OCS notified Nome, the BIA and, for reasons not reflected in the record, the Tanana Chiefs Conference. Notably, Nome and Tanana Chiefs Conference tribes do not overlap the same geographic area as CIRI.[71] When Jimmy claimed to be a descendant of a CIRI

---

**68** 25 C.F.R. § 23.107(b)(1).

**69** BIA GUIDELINES, *supra* note 27, at 21.

**70** 25 C.F.R. § 23.107(b)(1) (specifying that state court must confirm agency used due diligence based on information in the record).

**71** There are 12 regional Alaska Native for-profit corporations, each with an affiliated non-profit corporation. *Compare The Twelve Regions*, ANSCA REG'L ASS'N,

shareholder, he was claiming heritage in a region other than the ones OCS had researched. There is no indication in the record that OCS followed up on those claims, despite the fairly straightforward and concrete steps OCS could have taken.[72]

Moreover, the record in this case does not confirm that OCS acted diligently, even based upon initial information available to the parties, prior to Jimmy's further disclosure about his mother. The record on this issue consists of copies of a letter sent to two tribal organizations and the BIA, certified return mail receipts indicating the letter was received by those entities, and vague discussion of follow-up during some of the court hearings. The record indicates that OCS heard back from the Nome Eskimo Community, but does not indicate whether OCS received any response from any other entity. After the Nome Eskimo Community reported that the children were not members, OCS investigated "another potential tribe." Then, during the contested probable cause hearing, OCS's attorney noted that after "checks were run again," it found the children were not Indian children. OCS indicated it reached this conclusion based upon information from the tribes and also from review of records.

---

https://ancsaregional.com/the-twelve-regions. CIRI covers the Cook Inlet Region. *Id.* The Tanana Chiefs Conference is the non-profit corporation for the interior region and it incorporated as Doyon, Limited following ANSCA. *Our History*, TANANA CHIEFS CONF., https://www.tananachiefs.org/about/. Nome, on the other hand, is within the Bering Straits Native Corporation Region. *History and Region*, BERING STRAITS NATIVE CORP., https://beringstraits.com/history-region/. None of these three regions overlap.

[72] We also note that OCS's original notice letters do not have any information about Jimmy's parents. Technically, the regulations require information about extended relatives to be in the notice to tribes and BIA only if known. 25 C.F.R. § 23.111(d)-(e). But gathering more information about the child's direct lineal ancestors from the parent that is claiming they are Indian children would be quite helpful to the tribes and BIA. There is no indication in the record that OCS ever asked Jimmy for information about his parents.

But it is not clear which other tribe OCS contacted, what was in the prior records, or whether OCS ever received any response from the BIA. The record in this case provides little to no information about what OCS did after sending out its initial letter of notice and inquiry.

Understanding the steps that OCS has taken in investigating children's tribal affiliation and providing notice to potentially affiliated tribes is necessary to confirm whether the agency acted with due diligence. And preliminary steps, without any clear follow-up, will often be insufficient. BIA commentary suggests that state agencies should make multiple repeated requests and seek the BIA's help in contacting a tribe before a court can make a determination based only on the information it has available.[73] In cases from other states, child welfare agencies have submitted the responses they receive from tribes and the BIA in the record, so the trial courts can ensure that the agencies have exercised due diligence.[74] Knowing which tribes were contacted, what their responses were, and whether the BIA responded or had any further information are all critical pieces of information in evaluating whether OCS acted with due diligence. Here, where much of this information is missing, the record is simply insufficient to establish diligence on OCS's part.

Because Jimmy provided a reason to know that his children are Indian children, and OCS failed to exercise due diligence in inquiring into the children's tribal

---

[73]     BIA GUIDELINES, *supra* note 27, at 22.

[74]     *See, e.g.*, *In re D.J.*, 862 S.E.2d 766, 771-72 (N.C. 2021) (upholding trial court's determination that child was not Indian child after state agency submitted letters to and responses from many tribes indicating that child was not member and confirmation from BIA that agency had conducted due diligence into trial court's records); *In re N.K.*, 851 S.E.2d 321, 335 (N.C. 2020) (holding that trial court failed to ensure due diligence occurred because there was only one response from all potential tribes in the record and no indication that the agency contacted BIA in the record).

affiliation and notifying potentially affiliated tribes, we vacate the superior court's order terminating Jimmy's and Allie's parental rights to Tamera and Ulysses and remand for further proceedings consistent with this opinion.[75]

**B.  The Superior Court Did Not Err When It Terminated Allie's Parental Rights To Martha And George.**

Having addressed the parents' ICWA-related arguments as to Tamera and Ulysses, we now proceed with addressing Allie's additional non-ICWA arguments about the superior court's other findings in the termination order. Allie argues that the court clearly erred in finding that she had not remedied the behavior causing her children to be in need of aid and erred in determining that OCS provided reasonable efforts.[76] Allie also challenges the court's finding that termination was in Martha's best interests. We see no error in these aspects of the superior court's termination order, and thus affirm the order terminating Allie's parental rights with respect to Martha and George.

**1.  The superior court did not clearly err when it found that Martha and George were in need of aid due to Allie's substance abuse and that Allie failed to remedy her substance abuse.**

It is not wholly clear whether Allie is challenging the superior court's finding that the children were in need of aid due to substance abuse or its finding that she failed to remedy her substance abuse. She argues that the children did not "remain" in need of aid at the time of trial, contending that OCS provided no evidence that Allie

---

[75]    Because we vacate and remand the termination of parental rights on other grounds, we need not reach Jimmy's claim that the case should be remanded because he did not receive effective assistance of counsel related to the application of ICWA to his family.

[76]    Jimmy made similar arguments about these aspects of the termination order with respect to him. Because we are vacating the order terminating parental rights as to Tamera and Ulysses on ICWA-related grounds, we do not address Jimmy's additional arguments.

continued to abuse substances after February 2021, the most recent time period reflected in the methadone clinic's UA results. We reject Allie's argument and affirm the superior court's CINA and failure to remedy findings.

First, the superior court's finding that the children were in need of aid due to parental substance abuse is well supported by evidence in the record.[77] Alaska Statute 47.10.011(10) provides that a child is in need of aid when the parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child." Ulysses came into OCS care as a result of testing positive for drugs, and both parents tested positive for those drugs at the same time. Law enforcement found Allie with controlled substances with Martha in her custody. Allie missed every UA scheduled by OCS, which can be considered failed tests.[78] Finally, Allie tested positive for controlled substances through February 2021 and refused to test in March 2021. This evidence provides unequivocal support for the superior court's finding that the children were in need of aid due to Allie's substance abuse.[79]

Next, we note that when determining whether a parent has remedied the behavior that placed the children in need of aid, the superior court may examine the

---

[77] Because we affirm the superior court's findings that the children were in need of aid due to substance abuse and that Allie failed to remedy that conduct, we do not reach Allie's challenge to the superior court's abandonment finding. We need only affirm one CINA finding to affirm the termination order. *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 266 (Alaska 2019).

[78] *Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 644 (Alaska 2013).

[79] *See id.* at 643-44 (holding missed urinalyses and drug-related criminal charges sufficient to support finding children in need of aid under AS 47.10.011(10)); *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1258-59 (Alaska 2010) (noting that drug use during pregnancy and failure to comply with treatment sufficient to support finding under AS 47.10.011(10)).

history of conduct by the parents and the likelihood that harmful conduct will continue.[80] "The superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[81] For example, we have affirmed findings that a parent failed to remedy substance abuse even after achieving short-term sobriety, if the parent failed to clearly admit substance abuse or take steps beyond abstinence to ensure sustained sobriety.[82]

Here, we acknowledge the evidence that Allie participated in methadone treatment. In spite of that treatment, though, Allie continued to abuse multiple substances, including amphetamine, opioids, and occasionally fentanyl. She provided no negative drug tests during the time period reflected in the methadone clinic's treatment records, and she refused to participate in OCS-approved counseling and testing. She also repeatedly told caseworkers she had done nothing wrong and therefore did not have to comply with OCS's directives. There is no evidence that Allie achieved sobriety, let alone sustained sobriety, or that she would be able to achieve sobriety within a reasonable time frame.[83]

In light of the overwhelming evidence that Allie's substance abuse continued through March 2021 and that Allie failed to meaningfully engage in treatment

---

[80] AS 47.10.088(b)(4)-(5); *Lucy J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 244 P.3d 1099, 1113 (Alaska 2010).

[81] *Casey K.*, 311 P.3d at 644 (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003)).

[82] *See Sherry R.*, 74 P.3d at 902-03 (noting that while parent had been sober for one year, superior court was justified in finding that parent had not internalized depth of problem); *Barbara P.*, 234 P.3d at 1261 (noting extended period of sobriety would be necessary to prove parent with significant history of substance abuse can maintain sobriety).

[83] AS 47.10.088(b)(1) (superior court may consider "the likelihood of returning the child to the parent within a reasonable time").

recommended by OCS or to recognize the impact of her drug use on her children, the court reasonably concluded that she had failed to remedy her substance abuse.

     **2.**     **The superior court did not err when it determined that OCS made reasonable efforts toward Allie.**

Allie also contests the superior court's determination that OCS made reasonable efforts to reunite the family. In concluding OCS made reasonable efforts, the superior court focused primarily on the OCS caseworker's testimony about the services provided and deemed those efforts reasonable under the circumstances. Included among the relevant circumstances was what the superior court characterized as the parents' "absolute lack of involvement" and hostility towards OCS.

OCS has a statutory duty to provide "timely, reasonable efforts . . . to enable the safe return of [children] to the family home."[84] OCS must identify the family support services that will assist the parent and refer parents to those services.[85] In making reasonable efforts, the primary consideration is the child's best interests.[86] "The efforts that OCS makes must be reasonable but need not be perfect."[87] What efforts to pursue and what timing is reasonable is within OCS's discretion.[88] But OCS must provide "uncompromising" efforts to every parent, even if the chances of success are

---

[84]     AS 47.10.086(a).

[85]     AS 47.10.086(a)(1)-(2).

[86]     AS 47.10.086(f).

[87]     *Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 645 (Alaska 2013) (quoting *Audrey H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008)).

[88]     *Id.* (quoting *Sean B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 251 P.3d 330, 338 (Alaska 2011)).

low.[89]  Additionally, a superior court may consider parents' level of cooperation with OCS in evaluating whether OCS made reasonable efforts.[90]

Allie argues that OCS failed to meaningfully case plan with her and thus the agency's efforts toward her family could not have been reasonable.  But Allie's argument is contradicted by evidence that OCS continuously attempted to case plan with her in spite of her ongoing resistance to working with OCS.  The OCS caseworker testified that she discussed Allie's case plan with her in detail during the initial case conference.  She further testified that Allie was resistant to case planning throughout the life of the case, would not discuss case planning over the phone, and failed to attend any of the case planning meetings that the caseworker scheduled with her.  The caseworker therefore had to create a case plan without Allie's input.  The superior court did not clearly err in crediting this testimony.

The superior court also noted that OCS offered Allie a myriad of services, including referrals for urinalysis, parenting classes, and substance abuse assessments, and ensured ongoing family contact.  Indeed, OCS continued to attempt to work with Allie through the termination trial.  OCS also points to additional efforts it made to support the family, including supervision of visits, conducting a relative placement

---

[89]  *Kylie L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 407 P.3d 442, 448 (Alaska 2017).

[90]  *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 310 P.3d 943, 953-54 (Alaska 2013).  Allie argues that the standard we described in *Mona J. v. State, Department of Health and Social Services, Office of Children's Services*, 511 P.3d 553 (Alaska 2022), for determining how to consider the impact of a parent's behavior on evaluating whether OCS's efforts were active should apply here. We have previously declined to apply *Mona J.* to reasonable efforts. *Slade R. v. Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, No. S-18252, 2022 WL 3906701, at *6 n.34 (Alaska Aug. 31, 2022) (unpublished opinion).  Regardless, the issues discussed in *Mona J.* are not reflected in this case.  Here, OCS continued to try to work with Allie despite her lack of cooperation, and the court considered that lack of cooperation among the many other services that OCS provided to the family.

search, attempting to place the children together, getting the children enrolled with Medicaid, and ensuring the children's medical and therapeutic needs were met.

Given the evidence presented regarding OCS's work with the family, including continuous efforts to work and communicate with Allie, the superior court did not err in determining that OCS's efforts toward the family were reasonable.

### 3. The superior court did not clearly err when it found that termination was in the children's best interests.

Allie contends that the superior court clearly erred in finding that termination of her parental rights would serve her children's — especially Martha's — best interests. In particular Allie argues the findings related to Martha's best interests were contradictory because the court found both that Martha was spending too much time with Allie and that Allie had abandoned her.

To terminate a parent's rights, the superior court must determine by a preponderance of the evidence that termination is in "the best interests of the child."[91] This is a "capacious" analysis that "require[s] a comprehensive judgment as to whether the child's best interests favor the termination of parental rights."[92] The superior court "is permitted to 'consider any fact relating to the best interest of the child, including' the statutory factors, when evaluating whether a parent has remedied his or her conduct."[93] Here, the superior court's best interests determination emphasized the great unlikelihood that Allie would be able to remedy her substance abuse within a reasonable time frame and the resulting likelihood that the harm to the children would continue unabated. These concerns, and the court's related findings, are well supported by the record.

---

[91]    AS 47.10.088(c); CINA Rule 18(c)(3).

[92]    *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 186 (Alaska 2008).

[93]    *Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1263 (Alaska 2010) (quoting AS 47.10.088(b)).

Further, the superior court did not find that Allie and Martha were spending too much time together; rather the court was concerned that Allie was exposing Martha to "substance abuse, domestic violence, and criminal activity." The court recognized the uncertainty of achieving permanency for Martha given her runaway status, but found that those concerns were outweighed by the harm that Allie would continue to cause Martha if her parental rights remained intact. The court noted that termination offered "at least the hope that [Martha] could be placed in a guardianship" she would find acceptable. The court did not clearly err in weighing those concerns or in finding that terminating Allie's rights was in Martha's and George's best interests.

## V. CONCLUSION

We AFFIRM the termination of Allie's parental rights to Martha and George. We VACATE the termination of Jimmy's and Allie's parental rights to Tamera and Ulysses and REMAND for further proceedings consistent with this opinion.